## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PACKABLE HOLDINGS, LLC F/K/A ENTOURAGE COMMERCE, LLC, *et al.*,[1] | Case No. 22-____ (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF BRIAN TEETS
## IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Brian Teets, hereby declare under penalty of perjury:

1. I am a Managing Director at Alvarez and Marsal North America, LLC ("A&M") within its commercial restructuring group. In addition, I am the Chief Restructuring Officer of Packable Holdings, LLC ("Holdings") and its affiliated debtors, debtors in possession, and affiliated non-debtors (collectively, "Packable" or the "Company") and have served in this role since August 28, 2022. Prior to that, I was the Interim Chief Financial Officer for the Company, a role I held beginning on May 19, 2022.

2. As Interim Chief Financial Officer, I was responsible for the overall financial management of Packable. As Chief Restructuring Officer, I am responsible for the coordination of the management team and the Company's retained professionals in the execution of the Company's wind-down plans. As a result of my tenure with Packable, my review of public and non-public documents, and my discussions with other members of Packable's management team, I am generally familiar with Packable's businesses, financial condition, day-to-day operations, and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Packable Holdings, LLC (6932); Greenpharm Ventures LLC (1513); Packable Media, LLC (6006); Pharmapacks, LLC (6676); Packable Ventures, LLC (1172); and Access Brands, LLC (8582). The location of the Debtors' service address in these chapter 11 cases is 1985 Marcus Avenue, Suite 207, Lake Success, NY 11042.

books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from Packable's employees or retained advisers in the ordinary course of my responsibilities. I am authorized by each of the above captioned debtors and debtors in possession (collectively, the "Debtors") to submit this declaration on behalf of the Debtors. References to the Bankruptcy Code (as defined herein), the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this declaration.

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court"). To minimize the adverse effects on their business and the value of their estates, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions"). I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases (the "Cases") and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

4.      To better familiarize the Court with Packable, its business, the circumstances leading up to these Cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into four sections. **Part I** provides background information on Packable's corporate history and operations. **Part II** offers detailed information on Packable's prepetition capital structure. **Part III** describes the circumstances leading to the filing of these

2

Cases. **Part IV** summarizes the relief requested in and the factual basis that supports the First Day Motions.

# I. BACKGROUND

## A. Packable's History and Operations

### 1. Packable's Corporate Structure and History

5. Founded in 2010, Packable is a privately-owned tech-enabled e-commerce company with its principal place of business in Hauppauge, New York. Packable operates as a third-party seller of health, beauty, and other consumer products on online marketplaces in North America.

6. Holdings (formerly known as Entourage Commerce, LLC) is a Delaware limited liability company and the parent holding company for four directly owned entities, Pharmapacks, LLC ("Pharmapacks"), Packable Media, LLC ("Media"), Greenpharm Ventures LLC ("Greenpharm"), and Packable Ventures, LLC ("Ventures"), each of which is a Debtor in these Cases. Access Brands, LLC ("Access"), also a Debtor, is a wholly-owned subsidiary of Ventures. Ventures also holds majority interests in certain non-Debtor joint ventures and brand partners. An organizational chart depicting Packable's current corporate structure is attached as **Exhibit A**.

7. Pharmapacks, which is Packable's main operating entity, primarily sells healthcare and beauty products. Media provides marketing and related services to Packable's brand partners. Greenpharm was formed for the purpose of reselling wellness products and nutritional supplements containing hemp derivatives, such as cannabidiol (commonly referred to as "CBD").[2]

---

[2] Greenpharm ceased operations prior to the Petition Date. For the avoidance of doubt, Greenpharm does not, and has not, engaged (either directly or indirectly) in the procurement, production, growing, sale or marketing of marijuana (whether recreational or medical) as defined under the Controlled Substances Act, 21, U.S.C. §§ 801-971 (the "CSA"), or any other controlled substance under the CSA, although it holds licenses to sell cannabis products from several states. To the extent any products procured, sold or marketed by Greenpharm were derived from the plant Cannabis sativa L, those products only involved or contained ingredients derived either from Hemp (as defined under the CSA) having a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent or the exempt part of the plant

Ventures facilitates the Company's investments in brand partners, and Access Brands holds the licenses to market products produced by the Debtors' joint ventures.

8. Since inception, the Debtors have relied on the proceeds of debt and equity capital raises to fund their operations and grow their business. On September 9, 2021, the Company announced that their next capital infusion would be provided through a business combination transaction (the "Highland Transaction") with Highland Transcend Partners I Corp. ("Highland"), a special purpose acquisition company ("SPAC"), pursuant to an Agreement and Plan of Merger, dated as of September 8, 2021, by and among Holdings, Highland, and certain other parties named therein (the "Merger Agreement").

9. As detailed below, the Merger Agreement was terminated by mutual agreement of Packable and Highland on March 25, 2022, leaving Packable without sufficient liquidity to fund its operations. As a result, the Debtors set out to chart a new path. In the short time between the termination of the Merger Agreement and the Petition Date, the Company worked to obtain multiple rounds of financing, and to implement an operational transformation designed to reduce its cash burn rate. During this time, the Company also received a non-binding term-sheet for $200 million in permanent refinancing (the "Financing Proposal") from a potential third-party lender group (the "Potential Lender") and worked to try to finalize that transaction. Despite their efforts, the Debtors were unable to close the transaction contemplated under the Financing Proposal. Packable ultimately failed to obtain a long-term solution to its liquidity needs and was forced to commence a wind-down of its operations. It filed these Cases to facilitate the sale of its

---

Cannabis sativa L. as set forth in the CSA. Prior to the cessation of its operations, Greenpharm's business did not involve the production and/or use of controlled substances.

assets and ensure that that the wind-down is conducted in an orderly and value-maximizing manner.

### 2. Overview of Packable's Assets and Revenues

10. Prior to the onset of the liquidity constraints that prompted this bankruptcy filing, the Debtors' business was in the midst of a capital-intensive growth stage of development and was incurring substantial losses despite generating increasing revenues. Packable generated approximately $373.3 million in revenue in 2020 and $427.6 million in revenue in 2021, which resulted in gross profits of approximately $176.7 million and $182.7 million, respectively. Packable's total operating expenses were $237.5 million for 2020 and $336.5 million for 2021, resulting in net losses of $113.9 million for 2020 and $175.2 million for 2021.

11. Packable's primary assets consist of inventory with an aggregate gross book value of approximately $79 million and intellectual property comprising its proprietary tech-enabled platforms. In addition, Packable holds minority investments in more than twenty brands, holds a majority interest in two additional brands, and is a majority equity holder in two joint ventures.

### 3. Overview of Packable's Operations

12. Prior to the filing of these Cases, Packable was a U.S.-based third-party retailer that provided integrated e-commerce services (including logistics, supply chain and inventory management services), data analytics, and marketing services to its brand partners. Packable's brand partners include more than a dozen household names and blue-chip companies, including Johnson & Johnson, Unilever, Bayer, Revlon, Bausch & Lomb, L'Oreal, and Reckitt Benckiser. Packable also served as a "launch pad" for emerging brands by giving a select amount of lesser-known brands access to Packable's eCommerce platform and consumer base.

13. At its peak, Packable carried over 31,000 stock-keeping units or "SKUs", operated across numerous online marketplaces and direct-to-consumer ("D2C") websites, and processed

more than 1.8 million orders each month for its customers. Packable's product catalog included health and beauty, hair care, nutrition, household, over-the-counter medicines and medical products, as well as other categories of goods such as baby and children's products, non-perishable food and beverages, and pet products. Packable purchased this inventory from its brand partners to fulfill orders across all of its marketplace partners as well as on D2C sites that it operated on the brands' behalf.

14.     Packable currently sells those products on five online marketplaces in North America, including Amazon, Walmart, eBay, Target, and Kroger. For some of its brand partners, Packable has the exclusive right to be their authorized third-party seller across these marketplace channels.

15.     Packable relies heavily on third parties to sell its products on eCommerce marketplaces. For example, Packable sourced all of the products it markets and sells directly or indirectly from a global network of third-party suppliers. Packable utilizes marketplace fulfillment and storage services, such as Amazon's "Fulfilled by Amazon" platform and Walmart's "Walmart Fulfilment Services" platform, to store its products at marketplace fulfillment centers and to pack and distribute these products to customers. Packable also relies on third-party national, regional, and local logistics providers to deliver the products it offers on online marketplaces and its websites.

16.     Throughout 2021, Packable was focused on expansion in this highly competitive industry by executing a number of growth strategies, including: expanding its brand partnerships; growing its marketplace relationships; expanding its fulfillment and distribution network; expanding its service offerings; and continuing to make minority investments in brands. In connection with those efforts, on February 16, 2022, Packable announced the planned opening of

a new warehouse and fulfillment facility in Parris, California (the "California Facility"). The California Facility was expected to open in the second quarter of 2022, with the goal of reducing shipping costs and delivery times to the West Coast.[3]

17.     Packable's operations were conducted from a variety of leased locations, including (a) two distribution and fulfillment centers located in Ronkonkoma, New York and Hauppauge, New York,[4] (b) a replenishment center located in Edgewood, New York, and (c) two offices located in New York, New York, and New Hyde Park, New York. In addition, Packable leases a warehouse facility in College Point, New York, which is subleased to a third party.

18.     At its peak, Packable had approximately 1,284 full-time and 22 part-time employees, all of whom were located in the United States. In connection with its turnaround strategy implemented after termination of the Merger Agreement, Packable enacted a substantial reduction of its workforce during May 2022, terminating approximately 722 employees. Upon the commencement of its liquidation efforts, Packable implemented a second reduction of its workforce on August 22, 2022, terminating approximately 138 employees. As of the Petition Date, Packable employs approximately 372 employees, of which approximately 324 work in the warehouses controlling inventory and fulfilling orders, and approximately 48 work in the corporate offices attending to various tasks necessary for the Company's liquidation. None of Packable's employees are represented by a union.

19.     Packable's remaining employees are expected to play a critical role in facilitating the sale of its assets and the orderly wind-down of its operations.

---

[3] Packable subsequently terminated its efforts to open the California Facility in order to preserve liquidity.

[4] Packable's lease for the Ronkonkoma facility was terminated shortly before the filing of these Cases.

## II.     SUMMARY OF PREPETITION DEBT

20.     Debtors Holdings and, with respect to the ABL Facility (defined below), Pharmapacks, are borrowers under Packable's prepetition bank debt, which is guaranteed by each of the other Debtors.  As of the Petition Date, Packable has approximately $271.8 million in total funded debt obligations, consisting of: (a) approximately $53.1 million in aggregate principal amount outstanding under the prepetition ABL Facility; (b) approximately $95.4 million in aggregate principal amount outstanding under the prepetition Term Loan Facility (defined below); (c) $110 million in aggregate principal amount outstanding under the 2021 Convertible Notes (defined below); and (d) $0.6 million in aggregate principal amount outstanding under the prepetition paycheck protection loans (the "PPP Loan").  In addition, certain Debtors are obligors on approximately $12.1 million in aggregate principal amounts outstanding under various equipment/capital financings and approximately $0.6 million in aggregate principal amounts outstanding under secured financings related to certain joint ventures in which the Debtors hold majority interests.  In addition, Packable has outstanding trade debt and other related purchase card obligations totaling approximately $48 million.

21.     The following table summarizes Packable's prepetition funded debt obligations:

| Debt | Maturity[5] | Outstanding Principal Amount as of August 28 2022 |
|---|---|---|
| **Secured Debt** | | |
| ABL Facility | January 15, 2023 | $53,135,280 |
| Term Loan Facility – Tranche A | October 14, 2029 | $86,652,935 |
| Term Loan Facility - Bridge | August 15, 2022 | $8,715,000 |
| Equipment/Capital Financings | Varies | $12,099,797 |
| JV Facilities | n/a | $574,313 |

---

[5]     Subject to certain springing maturities, as provided for in the applicable credit agreements.

| Debt | Maturity[5] | Outstanding Principal Amount as of August 28 2022 |
|---|---|---|
| **Total Secured Debt** | | **$161,177,325** |
| **Unsecured Debt** | | |
| 2021 Convertible Notes | September 9, 2026 | $110,000,000 |
| PPP Loan | April 2025 | $619,056 |
| **Total Unsecured Debt** | | **$110,619,056** |
| **Total Funded Debt** | | **$271,796,381** |

### A.  Prepetition ABL Facility

22.  On July 24, 2020, Holdings and Pharmapacks (the "ABL Borrowers"), along with the other Debtors as guarantors, entered into the Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"), with JPMorgan Chase Bank, N.A. (the "ABL Agent") as agent and lender, and the additional lenders from time to time party thereto (the "ABL Lenders" and, together with the ABL Agent, the "ABL Secured Parties"), pursuant to which the ABL Lenders provided an asset-based revolving line of credit to the ABL Borrowers (the "ABL Facility") in an aggregate principal amount not to exceed $60.0 million (as of the Petition Date), with availability based on the value of certain of the Debtors' accounts receivable and inventory, less certain offsets, reserves, and availability blocks.  The ABL Facility matures on January 15, 2023.

23.  Borrowings under the ABL Facility bear interest at a rate per annum equal to the 30-day LIBOR, with a 0.25% rate floor, plus 3%.  The ABL Borrowers are also required to pay a commitment fee that accrues at a rate of 0.50% per annum on the average daily amount of the available revolving commitment during the period from the facility effective date to the day before the revolving commitments terminate.

24.     All obligations under the ABL Facility are guaranteed on a senior secured first-lien basis by each of Packable's wholly owned domestic subsidiaries and are secured, subject to permitted liens and other exceptions, by perfected first-priority security interests in and liens on substantially all of the ABL Borrowers' and their wholly owned domestic subsidiaries' property and assets.  This includes the ABL Lenders having cash dominion over the Debtors' operating accounts and, in specified circumstances, over their investment account.

25.     On April 14, 2022, contemporaneously with the closing of the Term Loan Facility (defined below), the ABL Lenders and Packable entered into a forbearance agreement (the "ABL Forbearance Agreement") to address certain defaults by Packable and an agreed-upon forbearance by the ABL Lenders.  The ABL Forbearance Agreement required Packable to maintain minimum liquidity of at least $10.0 million at all times, and to deposit cash into a restricted cash account to cure any deficiency in the borrowing base in the event the borrowing base fell below $47 million. The ABL Forbearance Agreement further provided (among other termination events) that it would terminate if Packable failed to raise at least $65.0 million in net tranche B Term Loan Facility proceeds by July 15, 2022.

26.     The discretionary net tranche B Term Loan Facility proceeds did not materialize. In light of this additional default, on July 21, 2022, contemporaneously with the closing of the Bridge Facility (defined below), the ABL Lenders and Packable entered into an amended ABL Forbearance Agreement (the "Amended Forbearance Agreement").  The Amended Forbearance Agreement retroactively extended the term of the forbearance through August 1, 2022, and provided (among other termination events) that it would terminate automatically if Packable failed to consummate a permanent refinancing transaction with the Potential Lender and repay the ABL Facility by August 1, 2022, or if the Potential Lender failed to obtain internal credit approval to

consummate such a transaction by 9:00 a.m. (Eastern) on July 29, 2022 (the "Credit Approval Termination Event"). The Amended Forbearance Agreement also required Packable to solicit bids for the purchase of all of Packable's assets by July 25, 2022, and to request that such bids be provided by July 29, 2022.

27.     As of July 29, 2022, the Potential Lender had not obtained internal credit approval to consummate the potential transaction, nor had any bid for the purchase of Packable's assets been received. On that same day, the ABL Agent issued a notice (the "Forbearance Termination Notice") that, in light of the occurrence of the Credit Approval Termination Event, the Amended Forbearance Agreement had terminated. Thereafter, the ABL Lenders exercised their contractual cash dominion rights with respect to Packable's operating accounts in accordance with the default provisions of the ABL Credit Agreement and swept cash held in those accounts, leaving Packable with a cash balance of approximately $1.7 million.

28.     Following the defaults and termination of the ABL Lenders' agreed forbearance, and notwithstanding the exercise of their cash dominion rights, the ABL Lenders continued to advance funds on a discretionary week-to-week basis for several more weeks as Packable's advisors attempted to pursue an alternative going concern transaction. The funding provided by the ABL Lenders during this period was used to support certain limited disbursements of Packable, including payroll-related expenses, in accordance with an agreed-upon budget and subject to certain termination events. Unfortunately, no alternative transactions came to fruition.

29.     As of the Petition Date, the aggregate principal amount, plus accrued interest, owing by the Debtors to the ABL Lenders under the ABL Credit Agreement is approximately $53.7 million (including outstanding letter of credit and purchase card obligations).

266702051 v14

### B. Term Loan Facility

30.    On April 14, 2022, Holdings entered into the Term Loan Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Term Loan Credit Agreement"), which governs a multi-tranche term loan facility (the "Term Loan Facility") with Alter Domus (US) LLC (the "Term Loan Agent") as agent, and the lenders from time to time party thereto (the "Term Loan Lenders" and, together with the Term Loan Agent, the "Term Loan Secured Parties"), pursuant to which certain Term Loan Lenders (the "Tranche A Term Loan Lenders") provided a term loan (the "Tranche A Term Loan") to the Debtors in aggregate principal amount of $86,652,935, comprised of $77,700,000 in new money advances and $8,952,935 of rolled outstanding accounts payable,[6] all of which remains outstanding.  The Term Loan Credit Agreement contemplated three potential additional tranches of term loans in an aggregate amount of up to $215 million, with any second tranche (the "Tranche B Term Loan") to be funded on or around July 15, 2022 in the amount of at least $65 million.  However, the potential Tranche B Term Loan and any subsequent tranches were uncommitted and at the Term Loan Lenders' discretion.

31.    The Tranche A Term Loan matures on October 14, 2029.  Borrowings under the Term Loan Facility earn interest at a non-default rate of 15% per annum, payable solely in kind.

32.    All obligations under the Term Loan Facility are guaranteed on a subordinated secured second-lien basis by each of Holdings' wholly-owned domestic subsidiaries.  The Term Loan Facility is secured by second priority liens on substantially all assets of Holdings and its wholly-owned domestic subsidiaries, including intellectual property.

---

[6] These rolled accounts payable were owed to certain vendors represented on Packable's Board that also agreed to participate in the new money advances under the Tranche A Term Loan.

33.	In June 2022, Packable learned that the uncommitted potential Tranche B Term Loan was not going to be funded.

34.	On July 21, 2022, certain Term Loan Lenders (the "Bridge Loan Lenders") provided a short-term loan pursuant to the Term Loan Credit Agreement to Holdings in an aggregate principal amount of $8,715,000.00 (the "Bridge Loan"), all of which remains outstanding.  The purpose of the Bridge Loan was to provide Packable with incremental liquidity while it attempted to finalize a permanent refinancing facility proposed to be provided by the Potential Lender.  The Bridge Loan is guaranteed by the same entities as those guaranteeing the Tranche A Term Loan and secured by the same assets with liens having the same priority as those securing the Tranche A Term Loan.  However, the Bridge Loan matured on August 15, 2022 and is entitled to repayment before the Tranche A Term Loan.

35.	On August 9, 2022, the Term Loan Agent issued a notice of default and reservation of rights with respect to the Term Loan Facility.

36.	As of the Petition Date, there is approximately $95.4 million in aggregate principal amount outstanding under the Term Loan Facility (including the Bridge Loan).

C.	**The Intercreditor Agreement**

37.	The respective rights of the ABL Secured Parties and the Term Loan Secured Parties (collectively, the "Prepetition Secured Parties") are governed by that certain Intercreditor Agreement dated as of April 14, 2022 (the "Intercreditor Agreement").  The Intercreditor Agreement provides, *inter alia*, that until all obligations under the ABL Facility have been indefeasibly paid in full, (a) the ABL Secured parties shall have the exclusive right to take any enforcement action with respect to the Prepetition Collateral, and (b) if the ABL Secured Parties consent to the Company's use of cash collateral in connection with an insolvency proceeding, the

Term Loan Secured Parties will be deemed to also consent and are subject to restrictions on the forms of adequate protection they may receive.

### D. JV Facilities

38.　　On July 30, 2021, Ventures entered into two facility agreements with a related party supplier, Reckitt Benckiser, who, as lender, agreed to provide Ventures, as borrower, with two secured term loan facilities of up to $1.0 million each (the "JV Facilities"). Interest on the JV Facilities is accrued at the prime rate. The JV Facilities are secured by Venture's majority equity interests in two joint ventures between Ventures and Reckitt Benckiser, CASA Home, LLC and Little Yawn Collective, LLC. As of the Petition date, there is approximately $574,313 in aggregate principal amount outstanding under the JV Facilities.

### E. Other Secured Debt

39.　　Certain of the Debtors entered into capital/equipment financing agreements with various parties including Raymond Leasing Corporation, Wells Fargo Financial Leasing, Inc., De Lage Landen Financial Services, Inc., U.S Bank National Association, CT Corporation (as representative for Ascentium Capital LLC), and Tech. Finance Co., LLC. Certain of the Debtors are required to make payments monthly at varying rates described in the capital/equipment financing agreements. The capital/equipment financing obligations are payable at various interest rates with maturity dates ranging from December 31, 2022 through February 28, 2027. As of the Petition Date, there is approximately an aggregate of $12.1 million in principal amount outstanding under the capital/equipment financing agreements.

### F. Unsecured Funded Debt

#### 1. 2021 Convertible Notes

40.　　In connection with the execution of the Merger Agreement, on September 9, 2021, Packable issued convertible notes in an aggregate principal amount of $110,000,000 (the "2021

Convertible Notes") through a private placement offering. Interest accrues on the 2021 Convertible Notes at 5.0% per annum and the 2021 Convertible Notes mature on September 9, 2026.

41.     The outstanding principal and accrued and unpaid interest on the 2021 Convertible Notes was to automatically convert at the closing of the Highland Transaction into Class A common stock of New Packable at a price per share that represented a 15% discount to the deemed price per share of the merger consideration received by existing equity holders under the transaction. Following termination of the Highland Transaction, the full amount of the 2021 Convertible Notes remains outstanding.

### 2.     PPP Loan

42.     In April 2020, Packable received loan proceeds in the amount of approximately $4.6 million (the "PPP Loan") under the Paycheck Protection Program (the "PPP") which was established as part of the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") administered through the Small Business Administration (the "SBA"). PPP loans are uncollateralized and guaranteed by the SBA and are forgivable after a "covered period" (eight or twenty-four weeks) as long as the borrower maintains its payroll levels and uses the loan proceeds for eligible expenses, including payroll, benefits, mortgage interest, rent and utilities. Any unforgiven portion of the PPP Loan is due on the fifth anniversary that the PPP Loan was disbursed. Packable used all proceeds for purposes consistent with the PPP requirements and believes that it meets the conditions for forgiveness of the PPP Loan.

### G.     Trade and Related Debt

43.     As of the Petition Date, the Debtors owed approximately $47 million in trade debt, as well as approximately $1 million in non-ABL Facility purchase card obligations incurred in connection with certain trade purchases.

266702051 v14

III.     **CIRCUMSTANCES LEADING UP TO THE BANKRUPTCY AND PREPETITION RESTRUCTURING EFFORTS**

A.     **Expanding Operations and Increasing Expenses**

44.     As noted above, prior to the commencement of these Cases, Packable was a growth phase company that required capital investments to fund its operations.  In part to effectuate that strategy, the Debtors took on certain debt and secured investments from various parties including key brand partners.

45.     By early 2021, Packable was exploring the possibility of becoming a public company.  On April 1, 2021, it was approached by Highland regarding a potential business combination through which the combined entity ("New Packable") would be a public company.

46.     In September 2021, Packable entered into the Merger Agreement with Highland. Packable expected to add approximately $434 million of cash to its balance sheet as a result of the Highland Transaction.  However, Highland's shareholders were entitled to redeem their shares in the event they did not support the transaction with Packable, which would reduce the amount of transaction proceeds available upon consummation of the Highland Transaction.

47.     Contemporaneously and in connection with the execution of the Merger Agreement, Packable issued $110 million in 2021 Convertible Notes to help ensure that it had sufficient capital pending the Highland Transaction closing.

48.     Following entry into the Merger Agreement, the Company incurred substantial losses and negative cash flows from operations as it continued to grow its business.  Among other things, Packable increased its employee headcount substantially, launched a rebranding campaign, and implemented a buildout of its existing proprietary infrastructure.  In addition, the Company leased and began a build out of the California Facility, which would allow it to fulfill orders placed on the West Coast more cost effectively.  While Packable materially increased its position in

competitive e-commerce markets as a result of these efforts, it was expending significant resources to fund its expansion.

49.     Packable also faced substantial headwinds due to a variety of other market and operational conditions.   In particular, Packable incurred increased operating expenses resulting from increases in the cost of goods sold from brand partners, diminished capacity at Packable facilities due to labor and supply shortages, and reduced capacity at shipping providers.  Inflation and increasing fuel surcharges also negatively impacted costs.  The combined strain of these factors accelerated Packable's cash burn and gave rise to a liquidity shortage.

50.     By February 2022, Packable was in imminent risk of triggering the ability of the ABL Lenders to exercise cash dominion over Packable's remaining cash on hand.  Packable also anticipated that its auditors would include going concern qualifiers in Packable's 2021 financial statements.   However, the Merger Agreement limited Packable's ability to seek additional or alternative funding sources, presenting Packable with a difficult choice:  (1) continue to pursue closing of the Highland Transaction, which presented the only concrete (although increasingly uncertain and potentially diminished) source of additional financing, or (2) terminate the Merger Agreement and pursue strategic alternatives on an extremely expedited timeframe.

51.     To assist in evaluating its options and managing its liquidity, Packable engaged A&M as financial advisor and J.P. Morgan Chase Bank ("JPMorgan") as investment banker. Packable also appointed an additional independent manager with experience in assisting distressed companies to its board of managers (the "Board") and formed a committee of its independent managers (the "Independent Committee"), which was tasked with evaluating and making recommendations regarding various strategic alternatives available to the Company.  Additionally, Packable implemented strict cash management and liquidity preservation measures.

266702051 v14

### B.     Termination of the Highland Transaction and a Capital Infusion

52.     On March 25, 2022, Packable and Highland mutually agreed to terminate the Merger Agreement.  Packable and its advisors quickly pivoted to pursuing alternative sources of desperately-needed liquidity.

53.     With the assistance of JPMorgan, Packable solicited financing proposals from certain of its existing investors and key vendors, which were determined to be the only realistic potential source of liquidity given the short timeframe available to avoid a default under the ABL Facility.  Packable received a number of proposals from certain of these parties.

54.     In consultation with its advisors, Packable decided to move forward with a proposal from a group of existing investors.  Pursuant to that proposal, the Tranche A Term Loan Lenders agreed to provide Packable with a portion the Term Loan Facility, a multi-tranche term loan in an aggregate amount of up to approximately $300 million.  The Term Loan Facility consisted of up to four potential tranches, only the first of which was committed.  Tranche A was funded by the Tranche A Term Loan Lenders on or about April 14, 2022, in the aggregate amount of approximately $87 million.  The potential Tranche B facility, if the Term Loan Lenders decided to provide it, was to be funded in an amount of at least $65 million on or about July 15, 2022.  The remaining $150 million under the Term Loan Facility was contemplated to comprise two potential incremental tranches.

55.     In connection with entry into the Term Loan Facility, Packable also entered into the ABL Forbearance Agreement.  Among other things, the ABL Forbearance Agreement required Packable to maintain minimum liquidity of at least $10 million at all times, and was to terminate (thereby allowing the ABL Lenders to exercise their contractual rights under the ABL Facility including with respect to their collateral) if Packable failed to raise at least $65 million in net Tranche B Term Loan Facility proceeds by July 15, 2022.

266702051 v14

56. In short, the efforts of Packable and its advisors resolved Packable's liquidity concerns for the near term. Packable had successfully obtained new financing that included the potential for additional future commitments in a matter of weeks and was positioned to execute its operational transformation.

57. Upon funding of the Tranche A Term Loan, Packable immediately took steps to improve its operating performance. Among other things, Daniel Myers was appointed by the Board as the interim Chief Executive Officer. Under Mr. Myers' direction, Packable made significant progress in achieving operational efficiencies, including reducing employee headcount and payroll expenses. Packable also focused on improving product margins by, among other things, optimizing the mix of products offered, rationalizing low dollar-value inventory, and passing through cost increases that it had previously absorbed.

58. In May 2022, Packable, with the assistance of JPMorgan, solicited interest in a rights offering to raise additional incremental funding. At the request of the Company's Board, JPMorgan contacted all existing investors including over 100 high net worth individuals and institutional investors, as well as over 30 new potential investors regarding an incremental financing tranche. Ultimately, the Company received indications of interest that only totaled approximately $4 million and abandoned the rights offering.

## C.  A Second Pivot and Further Negotiations Regarding Strategic Alternatives

59. In late June 2022, Packable learned that the potential and uncommitted $65.0 million Tranche B Term Loan was not going to be funded. Packable (acting primarily through the Independent Committee, which had remained in place following the funding of the Tranche A Term Loan) and its advisors once again quickly pivoted to identifying alternative funding sources or other strategic alternatives that would allow Packable to continue operating as a going concern.

To further assist with outreach and solicitation efforts, the Independent Committee engaged Greenhill & Co., LLC ("Greenhill"), which replaced JPMorgan as Packable's investment banker.

60.     Greenhill contacted 186 parties regarding potential transactions that would provide Packable with the liquidity it needed.  Sixty of those parties entered into non-disclosure agreements and were given access to diligence materials.

61.     The only party to provide Packable with a financing proposal in response to Greenhill's initial outreach was the Potential Lender.  On July 7, 2022, Packable and the Potential Lender executed a term sheet outlining the Potential Lender's non-binding proposal to provide Packable with a senior secured credit facility (the "Potential Refinancing Facility") in the aggregate principal amount of $200 million, consisting of (a) a fully funded $100 million first lien senior secured revolver, (b) a $50 million first lien senior secured term loan, and (c) a $50 million first lien senior secured delayed draw term loan, with a closing date of July 31, 2022.  The proceeds of the Potential Refinancing Facility would be used to fund working capital, repay the ABL Facility, and pay transaction related fees and expenses.  The Potential Lender's commitment to enter into the Potential Refinancing Facility was conditioned on, among other things, the completion of satisfactory legal and business diligence.  In consideration of the time and resources that the Potential Lender was proposing to devote to closing the refinancing transaction, Packable paid the Potential Lender a $300,000 work fee upon execution of the term sheet, as well as a $300,000 consulting fee to cover diligence costs.  The Financing Proposal term sheet also provided that Packable would negotiate exclusively with the Potential Lender regarding a permanent refinancing facility through the earlier of July 31, 2022 or the Potential Lender's termination of the Financing Proposal.

62.     In agreeing to pursue the Financing Proposal, the Independent Committee and Board were advised that, while closing the Potential Refinancing Facility in a three-week time frame would be extremely challenging, it could potentially be accomplished in light of the substantial resources the Potential Lender was proposing to expend and the fact that the Potential Lender was already familiar with Packable due to a prior relationship with the Company as a lender and investor.   The Independent Committee and Board were also advised that the Potential Refinancing Facility represented the only viable option to try to avoid a liquidation of the Company.

63.     Packable's efforts to execute on the Potential Refinancing Facility required the consent of the ABL Lenders to a further forbearance, as well as additional incremental financing to prevent further defaults under the ABL Facility and fund the Company's normal course operations pending closing on the facility.   Over the second and third weeks of July, the Company and its advisors (a) negotiated and executed the Amended Forbearance Agreement with the ABL Lenders, (b) negotiated and closed the Bridge Facility, and (c) engaged extensively with the Potential Lender's advisors to provide timely and thorough responses to the Potential Lender's various diligence requests.

64.     While Packable was focused on completing each of these workstreams on an expedited basis, the Company also understood there was a significant risk that the Potential Refinancing Facility would not close before the expiration of the Amended Forbearance Agreement, and there was no guarantee that the ABL Lenders would agree to additional extensions.   Accordingly, the Company's advisors were also engaging in parallel contingency planning efforts.  As required under the Amended Forbearance Agreement, Packable solicited bids for the purchase of their assets, prepared motions contemplating a chapter 11 filing, and began

21

negotiating with the ABL Lenders regarding the terms of debtor in possession financing and/or consensual cash collateral usage should a liquidation of the business prove to be necessary.

65.    By July 29, 2022, despite its advisors' best efforts, Packable had not been able to secure any committed source of rescue financing or capital infusion.  The ABL Lenders issued a Forbearance Termination Notice and exercised dominion over Packable's cash on hand.  Since that time, although they have no contractual obligation to do so, the ABL Lenders have been providing Packable with limited funding to satisfy certain approved obligations including payroll related expenses.  That discretionary funding provided Packable with several weeks of additional runway to try to obtain a binding commitment to pursue a transaction that would allow the Company to continue operating as a going concern or otherwise maximize value for stakeholders.

66.    However, also on July 29, 2022, the Potential Lender rescinded its Financing Proposal and submitted a revised, non-binding proposal (the "Acquisition Proposal") to acquire substantially all of the Company's assets for $45 million pursuant to section 363 in a chapter 11 bankruptcy proceeding.  This revised proposal was again subject to the completion of due diligence and did not include any prepetition financing component.  The Acquisition Proposal represented a significant departure from the terms of the Financing Proposal, and the Independent Committee determined that it would negatively impact the ability of the Company to operate as a going concern.  At the Independent Committee's request, Greenhill sought to negotiate improvements to the Acquisition Proposal that would be acceptable to the Independent Committee and the ABL Lenders.  Those negotiations were unsuccessful and on August 4, 2022, the Potential Lender advised Greenhill that it had decided not to move forward with any transaction involving the Company.

266702051 v14

67.     Upon receiving that information, Greenhill continued its efforts to solicit bids for a transaction with the Company from other parties and received indications of interest from a number of them.  Only one of those parties (which had also been part of the Potential Lender group) submitted a formal proposal to acquire the Company.  The Company and the ABL Lenders engaged in extensive negotiations with that potential buyer regarding the terms of its proposal.  Ultimately, however, the Company determined that the proposal was not actionable due to, among other things, the failure of any party to provide committed financing to support the continued going concern process, which resulted in a lack of support from the ABL Lenders.

**D.     Wind Down Commencement and Case Path**

68.     In the absence of any viable alternative, Packable pivoted quickly to a liquidation and wind-down strategy in an effort to preserve and distribute as much value to creditors as possible.  Among other things, Packable implemented a substantial reduction of its workforce on August 22, 2022, terminating approximately 138 employees that were determined to be non-critical to Packable's wind-down, including approximately 90% of its remaining corporate staff.  The Company issued final paychecks to these terminated employees on August 26, 2022.

69.     As detailed in the Cash Collateral Motion, the ABL Lenders have agreed (and the Term Loan Lenders are deemed to consent) to allow the Debtors to use their cash collateral to fund the wind-down process on an expedited time frame, subject to and in accordance with an agreed budget (the "Agreed Budget").  The Cash Collateral Motion sets out the terms of the Debtors' proposed consensual use of the Prepetition Secured Parties' cash collateral, which include adequate protection provisions that grant the Prepetition Secured Parties' replacement liens and superpriority claims to protect against the diminution in value of their collateral, as well as providing for the mandatory paydown of the ABL Facility during the Cases.

70.     In addition, a third party investor has contributed funding for separation assistance payments that will provide terminated Packable employees with two weeks' regular salary, subject to, among other conditions, Bankruptcy Court approval, which is being sought pursuant to the Wages Motion (defined below).   The separation assistance payments will be distributed to terminated employees through Packable's payroll system for administrative efficiency, but are not being paid from assets of the Debtors' estates and do not constitute cash collateral of the Prepetition Secured Parties.

71.     The Debtors anticipate liquidating their remaining assets, consisting primarily of inventory, intellectual property, and equity investments in certain client brands.   As detailed in the Liquidation Sales Motion (defined below), the Debtors have retained Hilco Merchant Resources, LLC ("Hilco") to assist in the sale of their inventory as well as their furniture, fixtures, and equipment.   The sale process will be funded with cash on hand, which is collateral of the Prepetition Secured Parties, in accordance with the provisions of the Cash Collateral Motion.

72.     Packable and its stakeholders hope to swiftly move through these cases in an effort to minimize administrative expenses and maximize recoveries for stakeholders.   Indeed, the expedited nature of these Cases is one of the cornerstones of the Debtors' compromise with their secured lenders and is fundamental to their continued support.

73.     Packable believes that an expeditious resolution to these Cases is necessary to ensure that administrative expenses that would erode creditor recoveries are kept to a minimum. Further, Packable believes that the relief requested in the various First Day Motions appropriately balances the need for the Debtors to swiftly proceed with their wind-down with the due process and notice required under the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

266702051 v14

## IV. EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

### A. The Proposed Cash Collateral Motion

74. I, together with other members of Packable's management and its advisors, have analyzed Packable's cash flow and determined that use of the cash collateral is required and sufficient to fund the costs of Packable's liquidation, including the administrative costs of the chapter 11 process, provided that the liquidation is conducted on an expedited time frame. The Cash Collateral Motion provides for the Debtors' consensual use of the Prepetition Secured Parties' cash collateral, in exchange for, among other things, the weekly pay down of the ABL Facility with proceeds of the liquidation process in excess of the funding required to administer the Debtors' Cases in accordance with the Agreed Budget.

75. As described in the Cash Management Motion (defined below), the ABL Facility contains a complex cash dominion mechanism that provides an efficient means to collect the Company's accounts receivable and apply those amounts on a regular basis to repay the outstanding obligations under the ABL Facility. Maintaining that mechanism and paying down the ABL Facility as Packable's assets are liquidated will avoid the need to replicate the mechanic and allow an orderly wind-down to occur without requiring redirection of payments or a potential delay in access to cash collateral while Packable's accounts receivable are swept into a non-Debtor account to repay the ABL Facility. Together, the Cash Collateral Motion and Cash Management Motion will allow Packable to fund the cost of these Cases and pay its employees, suppliers, and others that are instrumental in facilitating the wind-down, preventing the unnecessary dissipation of estate value that might otherwise result. Without access to the Prepetition Secured Parties' cash collateral, I believe that substantial value degradation would occur as a result of Packable's inability to fund an expeditious and efficient wind-down, to the detriment of creditors.

266702051 v14

76. Accordingly, I believe that the Cash Collateral Motion will provide critical liquidity and is in the best interest of Packable's stakeholders and the Debtors' estates.

## B. Other First Day Motions[7]

77. Contemporaneously herewith, Packable has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize Packable's business operations, facilitate the efficient administration of these Cases, and expedite a swift and orderly wind-down process. The First Day Motions include the following:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Business Forms, and (C) Perform Intercompany Transactions, and (II) Granting Related Relief* (the "Cash Management Motion");

- *Motion of Debtors for Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits; (II) Authorizing, But Not Directing, the Debtors to Continue Certain Employee Benefit Programs in the Ordinary Course; (III) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations; (IV) Approving the Contribution Agreement; and (V) Granting Other Related Relief* (the "Wages Motion");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief;*

---

[7] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor All Obligations in Respect Thereof, (B) Renew, Supplement, and Enter Into New Insurance Policies, (C) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, and (D) Enter Into New Premium Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief;*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief;*

- *Motion of Debtors for Interim and Final Orders (I)(A) Confirming, on an Interim Basis, That the Inventory Disposition Agreement Is Operative and Effective and (B) Authorizing, on a Final Basis, the Debtors to Assume the Inventory Disposition Agreement; (II) Authorizing and Approving Inventory and FF&E Sales Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (the "<u>Liquidation Sales Motion</u>"); and

- *Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief*

78. The First Day Motions seek authority to, among other things, obtain consensual use of cash collateral, honor employee-related wages and benefits obligations, continue the Debtors' cash management system, and continue the ongoing liquidation of the Debtors' assets.

79. I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable Packable to liquidate via chapter 11 with minimal loss of value, (b) constitutes a critical element in Packable achieving an efficient and value-maximizing liquidation process, and (c) best serves the Debtors' estates and creditors' interests. I have reviewed each of the First Day Motions and the facts set forth therein are true and correct and incorporated herein in their entirety by reference. If asked to testify as to

27

the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:       August 28, 2022

/s/ *Brian Teets*
Name:  Brian Teets
Title:   Chief Restructuring Officer

266702051 v14

# Exhibit A

## Corporate Organizational Structure

# Packable Legal Organizational Chart



**Packable Holdings, LLC**
*(fka Entourage Commerce, LLC)*

— 100% — **Greenpharm Ventures LLC**

— 100% — **Packable Media, LLC** *(fka 1516 Media Group, LLC)*

— 100% — **Pharmapacks, LLC dba Packable**

— 100% — **Packable Ventures, LLC** *(fka Pharmapacks Brand Holdings, LLC)*

Packable Ventures, LLC:
- 51% — **Pacific Shaving Company**
- 70% — **Theraplex, LLC**
- 100% — **Access Brands, LLC**
- 66.6% — **CASA Home, LLC**
- 66.6% — **Little Yawn Collective, LLC**

*Majority-Owned Brands* (Pacific Shaving Company, Theraplex, LLC)

*Reckitt Joint Venture* (Access Brands, LLC, CASA Home, LLC, Little Yawn Collective, LLC)

Legend:
- ☐ Wholly Owned
- ☐ Majority Owned

*Last Updated March 2022*