## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PACK LIQUIDATING, LLC*, et al.,* | Case No. 22-10797 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Related Docket No. 1027** |

## <u>MEMORANDUM OPINION</u>

The debtors operated an e-commerce business, as third-party sellers of health, beauty, and other consumer products on online marketplaces.[1]  They filed for bankruptcy after raising several rounds of debt and equity financing, followed by the collapse of a potential merger with a special purpose acquisition company ("SPAC") under which the debtors would have become a public company that allegedly would have been valued at $1.5 billion.[2]  As the first-day declaration describes, after the SPAC merger failed, the debtors shifted their efforts to pursuing a going-concern sale. Those efforts, however, were unsuccessful, leaving the debtors to wind down their affairs through an orderly liquidation in bankruptcy.[3]

The Official Committee of Unsecured Creditors appointed in this bankruptcy case alleges that the business failure is not the result of a challenged SPAC market

---

[1] D.I. 13 at 3.  Packable Holdings, LLC is referred to as "Packable."  Packable; Greenpharm Ventures LLC; Packable Media, LLC; Pharmapacks, LLC; Packable Ventures, LLC; and Access Brands, LLC are collectively referred to as "the debtors."

[2] *See generally* D.I. 13.

[3] *Id.*

and generally unfavorable business conditions, but instead was caused by mismanagement and self-dealing by the company's insiders.[4] The Committee has filed an adversary proceeding asserting those claims, as well as claims for equitable subordination, the avoidance and recovery of alleged fraudulent conveyances, and the disallowance of claims.[5]

The defendants in the adversary proceeding do not challenge the Committee's authority to pursue the claims other than those for breach of fiduciary duty. Certain of the defendants in the adversary proceeding have, however, objected to the Committee's motion for standing to pursue claims for breach of fiduciary duty.[6] They argue that because the debtors are Delaware limited liability companies, and the Delaware Limited Liability Company Act provides that only the members of a Delaware limited liability company or the company's assignees may be given derivative standing to act on behalf of the company, the Committee cannot be given derivative standing to pursue the potential estate cause of action in bankruptcy.[7]

The defendants' argument relies primarily on three published opinions, issued by judges of this Court, that have either held or suggested that the Delaware Limited Liability Company Act and the Delaware Supreme Court opinion in *CML V, LLC v.*

---

[4] The Official Committee of Unsecured Creditors is referred to as the "Committee."

[5] *See Official Committee of Unsecured Creditors of Pack Liquidating, LLC v. Vagenas,* et al., Bankr. D. Del. Adv. Proc. No. 23-50590-CTG, D.I. 1 (Sept. 28, 2023). Pleadings filed in this adversary proceeding are cited as "Adversary D.I. __."

[6] The defendants who object to the motion are Adam Berkowitz, Bradley Tramunti, James Mastronardi, Andrew Vagenas, and the entities affiliated with those defendants. *See* D.I. 1050 n.62. These are referred to, collectively, as the "objecting defendants."

[7] The Delaware LLC Act is codified at 6 *Del. C.* § 18-101, *et. seq.*

*Bax* that construes the Act, operate to preclude a bankruptcy court from granting an official committee standing to pursue an estate cause of action in bankruptcy.[8]

No opinion of a trial court judge is formally binding on another trial court judge. There are, however, important reasons, stemming both from rule-of-law principles as well as (for courts with business dockets) ordinary commercial sense, for judges sitting on multi-judge courts to strive for as much consistency and harmony in their rulings as is practicable. The Court is therefore loath to break with the only three written opinions by judges of this Court to have addressed the topic.

For the reasons explained below, however, this Court does not believe that those opinions can be squared with the Third Circuit's *en banc* opinion in *In re Cybergenics*, which treats the authority to grant a committee derivative standing to pursue an estate claim as one that stems from the Bankruptcy Code rather than state law.[9] Under *Cybergenics*, the authority to grant committee standing is one of the many tools that the Bankruptcy Code grants to bankruptcy courts – like the power to appoint a chapter 11 trustee, to appoint an examiner, or to convert the case to one under chapter 7 – to ensure that a debtor-in-possession is performing its role in the bests interests of the estate. While an order granting a committee standing (unlike the use of the other tools) can fairly be described as authorizing a "derivative" lawsuit,

---

[8] *See CML V, LLC v. Bax,* 28 A.3d 1037 (Del. 2011). The three published opinions of this Court are *In re HH Liquidation, LLC,* 590 B.R. 211 (Bankr. D. Del. 2018); *In re PennySaver USA Publishing, LLC,* 587 B.R. 445 (Bankr. D. Del. 2018); and *In re Citadel Watford City Disposal Partners, L.P.*, 603 B.R. 897 (Bankr. D. Del. 2019).

[9] *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548 (3d Cir. 2003).

it is a federal rather than state-law derivative action, and thus not the subject of the Delaware Limited Liability Company Act.

In light of the *Cybergenics* analysis (which is controlling in this Court), it necessarily follows that a decision authorizing a committee to assert an estate cause of action (which will be described herein as a "*Cybergenics* action") does not conflict with *Bax.* *Cybergenics* actions and state-law derivative actions are simply two different kinds of creatures. Alternatively, however, even if one were to view the principles of *Cybergenics* and *Bax* as being in conflict, ordinary principles of federal supremacy would require the authority that the Third Circuit found implicit in the Bankruptcy Code to preempt any contrary state law.

None of the prior opinions on this issue by judges of this Court addresses the import of the Third Circuit's decision in *Cybergenics*. The Court accordingly concludes that its overriding obligation faithfully to apply binding Third Circuit precedent must prevail over the prudential concern for maintaining uniformity among the judges of this Court. The Court therefore holds that the Delaware Limited Liability Company Act does not preclude it from granting the Committee standing to pursue an estate cause of action if the established standards for granting that relief are otherwise met.

On that question, the Court concludes that the Committee's claim against the objecting defendants is sufficiently colorable to be permitted to proceed. In fairness, the objecting defendants assert serious arguments that the claims may be barred by virtue of the company's formation documents that exculpate them from any claim for

4

breach of fiduciary duty.  The Committee, however, has a fair response that the exculpation provisions are limited to the defendants' capacities as managers, and do not extend to their separate roles as officers.  While those issues are touched on in the parties' briefing, the Court does not believe it appropriate to issue a definitive ruling on this question based on the limited briefing now before it.  Specifically, the question of the "capacity" in which the defendants are sued was raised only in a post-hearing brief filed by the Committee, to which the objecting defendants have not had the opportunity to respond.  Accordingly, although in many contexts courts have (sensibly) found that the question whether a claim is "colorable" to depend on a showing that the claim will survive a motion to dismiss, in the unusual circumstances presented here, the Court concludes only that, based on the current state of the record and briefing before it, the claims are sufficiently colorable for the Court to grant the Committee standing to assert the estate's claim.  That ruling, however, is without prejudice to any of the rights of the parties on the question whether the complaint, in its current form, states a claim that will survive a motion to dismiss.

### Factual and Procedural Background

In 2010, Andrew Vagenas, Bradley Tramunti, and James Mastronardi formed a company that would eventually become Packable, which is the lead debtor and ultimate parent company of the other debtors in these bankruptcy cases.  Packable, a Delaware limited liability company, operated as a third-party seller of health and beauty products on online marketplaces in North America.[10]  Since the company's

---

[10] D.I. 13 at 3.

inception, the debtors relied on "proceeds of debt and equity capital raises to fund their operations and grow their business."[11]

The heart of the Committee's complaint is the allegation that the company's insiders have, over many years, put their own interests ahead of the those of the company itself. The insiders in question include the company's original founders, as well as strategic partners that invested in the company and obtained the right to appoint members to the company's board.

The current motion, however, involves only the claims asserted against the original founders and entities they control. The Committee alleges, among other things, that these defendants used the proceeds of a substantial capital infusion to redeem their own shares, rather than invest those proceeds in the company's infrastructure. It is alleged that this decision drained the company of the capital that was necessary to the ultimate success of the business.

The Committee's standing to assert the various bankruptcy claims set out in the complaint was the subject of a prior stipulation approved by the Court.[12] And while the Committee suggests that this stipulation (as well as a prior one) implicitly authorized it also to assert the fiduciary duty claims on behalf of the estate, it now (as an abundance of caution, it says) moves the Court for standing to assert the fiduciary duty claims on behalf of the estate.[13] The Court, however, does not believe

---

[11] *Id.* at 4.

[12] D.I. 769.

[13] D.I. 1027 at 2.

that the existing stipulations cover the claims for breach of fiduciary duty. One stipulation applies to the entities that were Term Lenders, while the defendants are different entities. Another stipulation applies to avoidance actions, which are different from the claims for breach of fiduciary duty at issue here. The Court will therefore proceed to address the merits of the motion.

Approximately two weeks before argument on the instant motion, this Court issued a letter ruling in an unrelated case that touched on the questions presented in this motion.[14] To ensure that the parties were aware of that ruling, the Court docketed a "notice" that called the parties' attention to it and suggested that the parties be prepared to address the issues at the October 19, 2023 hearing on the motion.[15] The October 19, 2023 argument was extensive and helpful to this Court. The parties also filed post-argument briefs to address issues that arose for the first time at argument.[16]

## Jurisdiction

This is a motion seeking authority to grant the Committee standing to pursue an estate cause of action. As will be explained below, the Third Circuit, in *Cybergenics*, held that the Bankruptcy Code implicitly authorizes a bankruptcy court to grant a committee derivative standing. The dispute now before the Court accordingly "arises under" the Bankruptcy Code, although the provision under which

---

[14] *Miller v. Mott, et al.*, Bankr. D. Del. No. 23-50004-CTG, D.I. 101 (Oct. 4, 2023).

[15] D.I. 1065.

[16] D.I. 1099, 1117.

it arises is implicit rather than express.  As such, the district court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1334(b).  This dispute has been referred to this Court under 28 U.S.C. § 157(a) and the February 29, 2012 Standing Order of Reference of the United States District Court for the District of Delaware. This is a core matter pursuant to 28 U.S.C. § 157(b)(2).

## Analysis

**I.    A bankruptcy court's order authorizing a committee to prosecute an action on behalf of a bankruptcy estate is different from a state-law derivative action.**

### A.    Traditional derivative actions are creatures of state law.

State corporate law provides mechanisms, both substantive and procedural, designed to ensure that those who manage or control the corporate entity do so in a manner that is consistent with the best interests of the entity's stakeholders. Substantively, state law impresses fiduciary duties on corporate officers and directors, requiring them to comport with the duties of care and loyalty that they owe to the corporation and its shareholders.[17]

State law also recognizes, however, that when a corporation holds a claim for breach of duty (or otherwise) against those who manage or control the corporation, the corporation's managers may resist calls to direct the corporation to sue themselves.  The derivative action is, at bottom, a state law procedural tool designed to address this problem.  Today, in the 36 states that have adopted the Model Business Corporation Act, the authority for the derivative action is provided by

---

[17] *See generally Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986).

statute.[18]  Under Delaware law, however, the basic principles governing derivative actions remain those fashioned at common law.[19]  The Delaware Supreme Court observed in *Schoon v. Smith* that the "judicially-created doctrine … known as the stockholder derivative action" traces its roots to equitable principles dating to the 14th Century.[20]  These principles are intended to provide a remedy to "the individual stockholder … in need of a means of invoking judicial power to curb managerial abuse."[21]

While the Delaware state-law derivative action is thus a judicially created one, it is subject to restrictions and limitations that have been statutorily adopted.[22]  For example, the *Schoon* decision explains that in adopting Delaware General Corporation Law § 327, the Delaware legislature limited the right to bring a derivative action to a shareholder who held shares at the time of the challenged transaction.[23]

Generally speaking, a state-law derivative action is a lawsuit brought by a shareholder who seeks standing to pursue a cause of action, on behalf of the

---

[18] For a list of states that have adopted the Model Business Corporation Act and the citations to the codification under applicable state law, see https://www.americanbar.org/content/dam/aba/administrative/business_law/mbca-resource-center-page-documents/corporate-laws-mbca-resource-centerlist-of-mbca-enactments-by-states.pdf.

[19] *See Schoon v. Smith*, 953 A.2d 196, 201 (Del. 2008) (noting that court of equity recognized derivative standing to provide shareholders with "a means of invoking judicial power to curb managerial abuse") (internal quotation omitted).

[20] *Id.*

[21] *Id.* (internal citation and quotation omitted)

[22] *Id.* at 204.

[23] *Id.*

corporation, that the corporation itself could have enforced in court.[24]  Unless it is
excused as futile, a shareholder is typically required to make a demand on the
company's board to assert the action before it is permitted to proceed on a derivative
basis.[25]  While derivative actions are principally creatures of state law, it bears note
that the Federal Rule of Civil Procedure 23.1, which applies to adversary proceedings
in bankruptcy court by virtue of Bankruptcy Rule 7023.1, sets forth the procedures
that govern derivative actions in federal court.[26]  The Third Circuit explained in
*Fagin*, however, that the rule is controlling only as to matters that are considered
procedural.[27]  On matters of substance, and there can be little doubt that the relevant
provisions of the Delaware Limited Liability Company Act would be deemed
substantive for this purpose, state law provides the rule of decision.[28]

   While derivative actions are typically asserted by shareholders, Delaware law
also recognizes that in the event of insolvency, creditors replace shareholders as the
residual beneficiaries of an increase in corporate value.  As such, the Delaware

---

[24] *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984).  The cause of action belongs to the corporation, which is the real party in interest.  *Ross v. Bernhard*, 396 U.S. 531 (1970); *Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518 (1947).

[25] *See generally United Food and Comm'l Workers Union and Participating Food Indus. Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021).

[26] *See Fagin v. Gilmartin*, 432 F.3d 276, 285 (3d Cir. 2005); *Gallup v. Caldwell,* 120 F.2d 90, 93 (3d Cir. 1941).

[27] *Fagin*, 432 F.3d at 285 n.2.

[28] *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 96-97 (1991).

Supreme Court has authorized creditors to sue derivatively to enforce the obligations that an insolvent company's directors owe to the corporation.[29]

**B.    The Delaware Limited Liability Company Act permits the exculpation of fiduciary duties and limits the availability of derivative lawsuits to enforce those duties.**

For Delaware limited liability companies, the Delaware Limited Liability Company Act makes both the substance of fiduciary duties and the procedures for enforcing them different than they are for Delaware corporations.   Substantively, Delaware law treats limited liability companies as "creatures of contract, 'designed to afford the maximum amount of freedom of contract, private ordering and flexibility to the parties involved.'"[30]   A limited liability company can be managed either by a "member" (which is the title for an owner of a limited liability company) or by a non-member manager.   Members can therefore either serve as managers or can be passive investors.[31]   As a general proposition, the manager of a limited liability company (whether or not the manager is a member), much like a corporate officer, owes fiduciary duties to the entity and its members.[32]   In addition, it bears note that various of Packable's managers also served as officers of the limited liability company.

---

[29] *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007).

[30] *TravelCenters of Am., LLC v. Brog,* No. 3516-CC, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008) (quoting *In re Grupo Dos Chiles, LLC,* No. 1447-N, 2006 WL 668443, at *2 (Del. Ch. Mar. 10, 2006)).

[31] *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 662 (Del. Ch. 2012).

[32] *See In re Bayou Steel BD Holdings, LLC*, 651 B.R. 179, 190 (Bankr. D. Del. 2023) (stating that "Delaware law presumes that managers of limited liability companies owe fiduciary duties unless explicitly disclaimed") (citations omitted).

The Delaware Limited Liability Company Act, however, allows for the exculpation of these fiduciary duties. The Act permits the company's operating agreement to expand, restrict, or eliminate a manager's fiduciary duties.[33] Further, the Act also permits the agreement to "leave the default duties in place, but limit or eliminate monetary liability for breach of duty."[34] The relevant provision states that:

> A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.[35]

Even where liability is limited or eliminated for the underlying fiduciary duty, the fiduciary obligation itself remains.[36] Additionally, an operating agreement may exculpate personal liability as to monetary damages, meaning the exculpation only addresses one of the available remedies for the breach of fiduciary duties. Other remedies, such as a declaratory judgment, would remain.[37]

Procedurally, like a shareholder of a corporation, a member of a Delaware limited liability company may sue derivatively for claims of breach of fiduciary duties that run to the company. The Delaware Limited Liability Company Act does,

---

[33] 6 *Del. C.* § 18-1101(c).

[34] *Feeley,* 62 A.3d at 664.

[35] 6 *Del. C.* § 18-1101(e).

[36] *Feeley*, 62 A.3d at 664; *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 847 (Del. Ch. 2022).

[37] *Id.*

however, impose procedural limitations on such a derivative lawsuit.  Section 18-1001

authorizes state-law derivative actions for Delaware limited liability companies:

> A member or an assignee of a limited liability company interest may
> bring an action in the Court of Chancery in the right of a limited liability
> company to recover a judgment in its favor if managers or members with
> authority to do so have refused to bring the action or if an effort to cause
> those managers or members to bring the action is not likely to succeed.[38]

Section 18-1002 describes who can be a plaintiff in a state-law derivative

action:

> In a derivative action, the plaintiff must be a member or an assignee of
> a limited liability company interest at the time of bringing the action
> and:
>
> > (1) At the time of the transaction of which the plaintiff complains;
> > or
> >
> > (2) The plaintiff's status as a member or an assignee of a limited
> > liability company interest had devolved upon the plaintiff by
> > operation of law or pursuant to the terms of a limited liability
> > company agreement from a person who was a member or an
> > assignee of a limited liability company interest at the time of the
> > transaction.[39]

These requirements thus function to bar creditors from bringing the kind of

derivative standing that creditors of a corporation may bring under *Gheewala*.  In

*CML V, LLC v. Bax,* the Delaware Supreme Court held that the Delaware Limited

Liability Company Act means what it says.[40]  There, CML, a creditor of the limited

liability company, sought to assert derivative claims for breach of fiduciary duties

against the company's managers.

---

[38] 6 *Del. C.* § 18-1001.

[39] *Id*. § 18-1002.

[40] *Bax*, 28 A.3d 1037.

The Delaware Supreme Court held that such a lawsuit was prohibited by the statute.   CML argued that, like creditors of an insolvent corporation under *Gheewalla*, creditors of an insolvent limited liability company should be able to assert derivative standing as the residual beneficiaries of any such claim.   The Delaware Supreme Court, however, held that the assertion of a derivative action was precluded by the Limited Liability Company Act.   The court explained that the sole recourse of a creditor of a limited liability company is to negotiate a contractual protection that would be enforceable directly, without resort to derivative standing.[41]

### C.   The type of action contemplated by *Cybergenics* derives from the Bankruptcy Code rather than state law and thus is not affected by the Limited Liability Company Act.

The central question before this Court is whether a decision of a bankruptcy court to authorize a committee to assert a claim on behalf of a bankruptcy estate is a derivative action that is subject to the Delaware Limited Liability Company Act.   Any fair reading of the Third Circuit's landmark decision in *Cybergenics* reveals that the answer to that question is no.   That opinion demonstrates that the *Cybergenics* court viewed an order authorizing committee standing as a tool, provided by federal bankruptcy law, that does not depend at all upon state law.   To be sure, state-law derivative actions and *Cybergenics* actions share a common ancestor.   Both grow out of the same ancient equitable practice.   It is thus unsurprising that state-law derivative actions and *Cybergenics* actions have many salient common features.   The critical point, however, is that in holding that the bankruptcy court could authorize

---

[41] *Id.* at 1046.

the committee in *Cybergenics* to pursue certain claims, the Third Circuit neither cited nor referred to any state law authorizing derivative standing. The authority to authorize such derivative standing was found to be implicit in the Bankruptcy Code, which effectively codified the same equitable principles from which state-law derivative actions emerged.

The unmistakable implication of *Cybergenics* is that the action it contemplated is one whose fundamental authority is the Bankruptcy Code. The painstaking *Cybergenics* opinion, written by then-Chief Judge Becker, did not rely in any way on the existence of a state-law authority for a shareholder or creditor to assert a derivative action. A federal bankruptcy court's ability to authorize a *Cybergenics* action therefore is not affected by the Delaware Limited Liability Company Act. That statute limits who can be a plaintiff in a state-law derivative action. By its terms, it is directed to suits filed in the Court of Chancery. It does not purport to address who may be a plaintiff in a proceeding authorized by the federal Bankruptcy Code.

The *Cybergenics* Court gave three reasons for its conclusion:

(1)    The more modest power to grant committee standing can be implied from the more drastic tools that the Bankruptcy Code grants to a bankruptcy court to ensure that the debtor-in-possession, as trustee, is fulfilling its fiduciary responsibilities;[42]

---

[42] *Cybergenics*, 330 F.3d at 576-579.

(2)     The power is implied from three specific provisions of the Bankruptcy

Code;[43] and

(3)     The power is a traditional equitable authority that was regularly

exercised under pre-Code practice and implicitly carried forward as a

retained equitable power.[44]

For present purposes, however, the central point is that each of these reasons

points unmistakably to the Bankruptcy Code rather than state law as the source of

authority for granting committee standing.  As such, it necessarily follows that the

authority is not affected by acts of a state legislature to limit the availability of state-

law derivative actions.

> **1.     The power to grant derivative standing is a "lesser power"
> that can be implied from the greater powers to convert a
> case to chapter 7, to appoint a chapter 11 trustee, or to
> appoint an examiner.**

A central innovation of Chapter 11 of the Bankruptcy Code, drawing on its

predecessor in the prior Chapter XI, is the notion that rather than immediately

appointing an independent trustee to oversee the estate of an insolvent debtor, the

presumption should be that existing management, with its "familiarity with the

business it had already been managing," should remain in possession of the debtor

and its assets.[45]  Section 1107 of the Bankruptcy Code, which grants the debtor in

possession the powers and duties of a trustee, means that the debtor in possession "is

---

[43] *Id.* at 560-567.

[44] *Id.* at 567-572.

[45] *See generally In re Marvel Entertainment Group*, 140 F.3d 463, 471 (3d Cir. 1998).

a fiduciary of the creditors" and is presumptively believed to be better suited to discharge those duties and maximize creditor recoveries than would a stranger to the business appointed as trustee.[46]

At the same time, however, the Code includes an array of statutory protections designed to ensure that the debtor in possession lives up to its statutory obligation to serve as a faithful trustee.  Section 1102 calls for the appointment of an official committee of creditors, charged with ensuring that the case is administered in a manner that protects creditor interests.[47]  To the extent creditors conclude that the debtor in possession is failing to carry out its obligations properly, § 1104 authorizes parties in interest to seek the appointment of either an independent trustee or an examiner.  And under § 1112(b), parties may seek to convert the case to one under chapter 7, in which case an independent chapter 7 trustee would be appointed to liquidate the business' assets.

The Third Circuit in *Cybergenics* confronted the argument that an order granting a committee standing to pursue a cause of action on behalf of the estate when the claim is a colorable one and the debtor in possession improperly declines to pursue it should be viewed as one of the tools in the statutory toolkit provided by the Bankruptcy Code to ensure that the estate is properly managed for the benefit of creditors and other stakeholders.  Indeed, the argument in *Cybergenics* was that the greater powers expressly granted by statute implied the existence of the lesser power

---

[46] *Id.*

[47] *See* 11 U.S.C. §§ 1102 and 1103.

to grant committee standing.[48]  Or in the perhaps more vivid language used by one of the *amici* in *Cybergenics*, requiring a bankruptcy court to appoint a chapter 11 trustee rather than grant a committee derivative standing "would amount to replacing the scalpel of derivative suit with a chainsaw."[49]

The Third Circuit agreed.  "[B]ecause much of Chapter 11 is premised on allowing current management to remain in control of the debtor, it is unlikely that Congress intended to force a court to displace that management in the relatively commonplace event that a debtor makes a questionable decision not to prosecute a fraudulent avoidance claim."[50]

The critical point in this context is that this authority to grant derivative standing arises out of the need to ensure that the chapter 11 process operates as intended.  The Bankruptcy Code strikes a careful balance between the value-maximizing potential of permitting the debtor's existing management to remain in possession and the need to ensure that the "trustee" in bankruptcy faithfully fulfills its fiduciary duties to creditors.  The *Cybergenics* court found that the bankruptcy court's authority to authorize a committee to pursue an estate cause of action to be an implicit part of this overall congressional design.  This authority must therefore flow from the Bankruptcy Code rather than state law.

---

[48] *See generally FERC v. Mississippi*, 456 U.S. 742 (1982) (Congress' greater authority to prohibit all state regulation of private interstate power transmission included the lesser authority to require states to consider federal standards).

[49] *Cybergenics*, 330 F.3d at 577 (internal quotation omitted).

[50] *Id.*

### 2. The power to grant derivative standing is implied from §§ 1109(b), 1103(c)(5), and 503(b)(3)(B).

In addition to the "big picture" analysis flowing from the purpose of chapter 11, the Third Circuit also pointed to specific Bankruptcy Code provisions from which it held that the power to grant derivative standing was implied. Specifically, the court found that §§ 1109(b), 1103(c)(5), and 503(b)(3)(B) "shed light on the role Congress intended creditors' committees to play in the reorganization process."[51]

The court surveyed each of these three Code provisions. Section 1109(b) expressly authorizes a creditors' committee to appear and be heard on any issue in a chapter 11 case, which the court found to "support the authority of bankruptcy courts to permit creditors' committees to bring claims on behalf of the debtor in possession for the benefit of the estate."[52]

Section 1103(c)(5) permits an official committee to "perform such other services as are in the interest of those represented."[53] The court concluded that this section "suggests that Congress intended for creditors' committees to perform services on behalf of the estate, and that Congress consciously built a measure of flexibility into the scope of those services."[54]

Section 503(b)(3)(B) contemplates the allowance of an administrative claim for a creditor "that recovers, after the court's approval, for the benefit of the estate any

---

[51] *Id.* at 560.

[52] *Id.* at 560-561 (emphasis omitted).

[53] 11 U.S.C. § 1103(c)(5).

[54] *Cybergenics*, 330 F.3d at 563.

property transferred or concealed by the debtor."[55]  In the absence of an authority to grant derivative standing to a creditor to assert a claim on the estate's behalf, such a provision would be rendered "entirely superfluous."[56]

Summarizing the import of this analysis, the Third Circuit concluded that "the most natural reading of the Code is that Congress recognized and approved of derivative standing for creditors' committees.  Section 1109(b) and 1103(c)(5), taken together, evince a Congressional intent for committees to play a robust and flexible role in representing the bankruptcy estate."[57]

### 3. The Bankruptcy Code preserves the court's residual equitable authority, commonly exercised in pre-Code practice, to grant derivative standing.

The Third Circuit recognized a "compelling" pre-Code practice in which bankruptcy courts regularly authorized creditors to bring suit on behalf of a bankruptcy estate when a trustee refused to do so.  After describing the case law on the question, the court of appeals concluded that it was "satisfied that the overwhelming balance of pre-Code opinion supports courts' power to confer derivative standing upon creditors."[58]

The difficulty the case presented, however, was that the action contemplated was a fraudulent conveyance action under § 544 of the Bankruptcy Code.  And § 544

---

[55] 11 U.S.C. § 503(b)(3)(B).

[56] *Cybergenics*, 330 F.3d at 563.

[57] *Id.* at 566.

[58] *Id.* at 571.

gives the power to assert such an action to the *trustee*.[59] Moreover, the Supreme Court had held in *Hartford Underwriters* that § 506(c), which authorizes the trustee to surcharge the value of a secured creditor's collateral for the "reasonable, necessary costs and expenses of preserving" the collateral to the "extent of any benefit" to the secured creditor, allowed *only* the trustee – not any other party in interest – to surcharge the collateral for such costs and expenses.[60] The court of appeals thus confronted the argument whether the language of § 544 similarly meant, notwithstanding the pre-Code practice, that "the trustee and only the trustee" – not a creditors' committee – may bring a fraudulent conveyance action under that provision.

The court held that it did not. The Third Circuit observed that the Supreme Court expressly stated in *Hartford Underwriters* that it was not addressing a court's authority to grant derivative standing but was only rejecting the individual creditor's claimed "independent right to use § 506(c)."[61] In addition to relying on the specific statutory provisions described above, the Third Circuit also focused on the equitable roots of bankruptcy law.[62] While the adoption of the Bankruptcy Code in 1978 (with its enactment of a detailed statutory scheme governing bankruptcy proceedings) made meaningful changes compared to pre-Code practice, the Third Circuit observed

---

[59] *See* 11 U.S.C. § 544(a) ("[t]he trustee … may avoid any transfer of property of the debtor … that is voidable by … [a hypothetical lien creditor]").

[60] *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000). *See also* 11 U.S.C. § 506(c).

[61] *Cybergenics*, 330 F.3d at 555 (citing *Hartford Underwriters*, 530 U.S. at 13 n.5).

[62] *Id.* at 567-569.

that Congress intended to carry forward certain of the equitable principles on which courts had relied under pre-Code practice.

Among those principles that the Third Circuit found to survive the adoption of the Bankruptcy Code was the traditional equitable authority – the same one described by the Delaware Supreme Court in *Schoon v. Smith* – of courts to permit "shareholders to pursue valuable actions when the nominal plaintiff (the corporation) unreasonably refused to do so."[63] Accordingly, while § 544 does indeed give the power to bring fraudulent conveyance actions to the trustee, the Code also implicitly embraces the equitable authority of the bankruptcy court to grant a committee derivative standing when the trustee declines to assert a valuable claim. "The end result of this equitable remedy – the estate's recovery of fraudulently transferred property – is precisely what Congress envisioned" in adopting the Bankruptcy Code, including the three specific statutory provisions described above.[64]

### D. Caselaw from outside the Third Circuit states expressly what is implicit from *Cybergenics* – that state law has no effect on a bankruptcy court's authority to grant committee standing.

The *Cybergenics* court relied expressly on decisions from the Second and Seventh Circuits that had concluded, after *Hartford Underwriters*, that bankruptcy courts had the authority to grant derivative standing to creditors' committees.[65] Like *Cybergenics*, these decisions from outside the Third Circuit make plain that they

---

[63] *Id.* at 568.

[64] *Id.* at 569.

[65] *Id.* at 566-567 (citing *In re Commodore Int'l Ltd.*, 262 F.3d 96 (2d Cir. 2001); *In re Caldor Corp*, 303. F.3d 161 (2d Cir. 2002); and *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000)).

viewed the authority to grant committee standing to be a federal law power that did not turn on any provision of state law.  And some of these decisions go further still, explaining expressly that this authority is not affected in any way by whatever state law may provide with respect to state-law derivative litigation.

For example, the Second Circuit in *In re Commodore International* considered whether a committee may sue officers and directors of the debtor corporation on behalf of the debtor for claims of fraud, waste, and mismanagement.[66]  There, the court explained that there were two circumstances in which it would be appropriate to grant committee standing.  Those circumstances were (1) if the committee had the consent of the debtor-in-possession or trustee, and (2) if the court found that granting the committee standing is in the best interest of the bankruptcy estate and the suit was necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.[67]

The Second Circuit had also addressed the issue of committee standing in *In re STN Enterprises.*[68]  The committee there sought to assert claims against the debtor's president and two directors for misappropriation and waste of corporate funds.  The court found that, despite the lack of explicit authority allowing for the committee to initiate such an adversary proceeding, there is an implied right for the

---

[66] *In re Commodore Int'l Ltd.,* 262 F.3d 96, 97-98 (2d. Cir. 2001).

[67] *Id.* at 100.

[68] *In re STN Enterprises,* 779 F.2d 901 (2d. Cir. 1985).

committee to pursue these claims in the name of the debtor-in-possession under §§ 1109(b) and 1103(c)(5) of the Bankruptcy Code.[69]

The Sixth Circuit likewise granted a committee derivative standing without reliance on state law.[70]  In *In re Gibson Group,* the committee sought standing to file an action to avoid fraudulent or preferential transfers where the debtor-in-possession refused to bring the action.  The court held that, similar to the holdings in other jurisdictions, a creditor (or a committee) may obtain derivative standing if it satisfies the following: (1) the creditor "alleged a colorable claim that would benefit the estate, if successful, based on a cost-benefit analysis performed by the bankruptcy court;" (2) the creditor made a demand on the debtor to file the action; (3) the demand had been refused;  and (4) the refusal was unjustified in light of the statutory obligations and fiduciary duties of the debtor.[71]  The court held that neither §§ 547 nor 548 preclude the "judicially-created doctrine of derivative standing," since "such standing furthers Congress's purpose in balancing the interests between the debtor and its creditors in a Chapter 11 reorganization."[72]

To the extent any of the courts of appeals that have addressed committee standing even refer to state law, they have rejected arguments that a federal bankruptcy court's authority to grant committee standing should depend on what state law provides.  For example, in *Louisiana World Exposition v. Federal Ins. Co.,*

---

[69] *Id.* at 904 (citations omitted).

[70] *In re Gibson Group, Inc.,* 66 F.3d 1436 (6th Cir. 1995).

[71] *Id.* at 1438.

[72] *Id.* at 1440.

the committee sought standing to pursue actions for gross negligence, mismanagement, and breach of fiduciary duty against the debtor corporation's officers and directors. [73]  The debtor there was a non-profit corporation, and while Louisiana state law imposed on the officers and directors a fiduciary duty running to the corporation, it did not appear to provide a mechanism (absent the appointment of a receiver) for creditors of an insolvent non-profit corporation to assert such a claim through a derivative lawsuit.[74]  The defendants' suggestion that granting the committee standing might be inconsistent with Louisiana state law, however, did not concern the Fifth Circuit at all.  Allowing the committee to take the place of the debtor-in-possession or trustee is "a procedural device, authorized by the Code, which does not affect state created property interests."[75]  Further, the court held that to the extent Louisiana had any interest in ensuring that any such claim be brought by a receiver (rather than a committee granted such authority by bankruptcy court order), "that interest must yield to the procedural needs and dictates of federal bankruptcy law."[76]

The Seventh Circuit's decision in *Fogel v. Zell* is to the same effect.[77]  The court held, in an opinion by then-Chief Judge Posner, that while the law of a company's state of incorporation determines who may bring a derivative suit, that is of "no

---

[73] *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 251 (5th Cir. 1988).

[74] *Id.*

[75] *Id.* at 252.

[76] *Id.*

[77] *Fogel v. Zell,* 221 F.3d 955 (7th Cir. 2001).

matter" in a chapter 11 case, because under federal bankruptcy law, the bankruptcy court retains the authority, in appropriate circumstances, to permit a creditor to "proceed in his place and in his name."[78]

Finally, Judge Wiles of the Southern District of New York Bankruptcy Court reached this same conclusion in the context of a Delaware limited liability company. Rejecting the argument that the Delaware Limited Liability Company Act precluded him from authorizing a committee to pursue an estate cause of action, Judge Wiles observed that the action contemplated was not one brought "under the authority of Delaware law, or under any other state's law."[79]  Rather, the committee was seeking an order "to authorize the committee to act as the estate representative to pursue claims that belong to the estates and to do so as a matter of federal bankruptcy law, not state law."[80]

\* \* \*

In sum, the bankruptcy court authority described by the *Cybergenics* court, to grant a committee standing to pursue an estate cause of action when a debtor in possession refuses to bring a potentially valuable claim, is a power that derives from federal law.  It does not rely or depend on the law of the state in which the debtor is incorporated.  As such, limitations on state-law derivative actions have no application to a *Cybergenics* action.  For that reason, the restrictions on derivative actions

---

[78] *Id.*  While this passage of *Fogel* appears to contemplate an individual creditor, rather than a creditor's committee, being granted standing to pursue an estate cause of action, the import is the same.

[79] *In re McClatchy Co.,* Bankr. S.D.N.Y. No. 20-10418, July 6, 2020 Hr'g Tr. at 30.

[80] *Id.*

imposed by the Delaware Limited Liability Company Act and described by the

Delaware Supreme Court in its *Bax* decision have no bearing on a bankruptcy court's

ability to authorize a committee to bring an estate cause of action.

## II.   Alternatively, even if the Delaware Limited Liability Company Act purported to prevent a bankruptcy court from granting a committee standing to pursue an estate cause of action, it would be preempted by the Bankruptcy Code.

This Court's principal holding, described in Part I above, is that it has the

authority to authorize a *Cybergenics* action in a case involving a debtor that is a

Delaware limited liability company, notwithstanding the Delaware Limited Liability

Company Act and *Bax*, because *Cybergenics* and the Delaware Limited Liability

Company Act operate in separate spheres.  The Delaware Limited Liability Company

Act governs state-law derivative actions involving Delaware limited liability

companies.  By the Act's express terms, it governs suits filed in the Court of Chancery.

By contrast, the authority to bring a *Cybergenics* action is a federal authority, outside

the scope of matters with which the Delaware Limited Liability Company Act is

concerned.

In the alternative, however, if the Delaware Limited Liability Company Act

sought to restrict the authority of a bankruptcy court to authorize a *Cybergenics*

action, such an effort would be unsuccessful because it would conflict with the

Bankruptcy Code and thus be preempted.  The Constitution's Supremacy Clause

provides that federal laws "shall be the supreme law of the Land; and the Judges in

every State shall be bound thereby, any Thing in the Constitution or Laws of any

state to the Contrary notwithstanding."[81]   Any state law that either interferes or conflicts with federal laws is thus preempted.[82]

Preemption can either be express or implied.   Preemption is express "when there is an explicit statutory command that state law be displaced."[83]   In the absence of an express statutory directive (which is absent here), state law is nevertheless preempted when federal law is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation."[84]   This implied preemption comes in two variations: field preemption and conflict preemption.[85]   The first involves situations in which federal law will so comprehensively regulate a field that "the federal system will be assumed to preclude enforcement of state laws on the same subject."[86]   Conflict preemption applies when a state law conflicts with a federal law such that "(1) it is impossible to comply with both state law and federal law;  or (2) the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[87]

---

[81] U.S. Const. art. VI, cl. 2.

[82] *See Gibbons v. Ogden*, 22 U.S. 1 (1824); *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712 (1985).

[83] *Green v. Fund Asset Management, L.P.,* 245 F.3d 214, 222 (3d Cir. 2001*). See also Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977).

[84] *Hillsborough County*, 471 U.S. at 713 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)).

[85] *Lozano v. City of Hazleton*, 724 F.3d 297, 302 (3d Cir. 2013) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)).

[86] *Rice*, 331 U.S. at 230 (citation omitted).

[87] *Orson, Inc. v. Miramax Film Corp.,* 189 F.3d 377, 382 (3d Cir.1999).  In a recent opinion, Judge Lopez of the Southern District of Texas held that a different provision of the Delaware Limited Liability Company Act was preempted because of a direct conflict with the Bankruptcy Code.  Section 18-304 of the Delaware Limited Liability Company Act provides

The form of preemption at issue here is implied rather than express. *Cybergenics*, after all, found the authority to grant committee standing to be one that was implicit in the Bankruptcy Code, not one that is set forth expressly in the statutory text. But the purpose of finding such an implied right was that doing so was critical to the fundamental chapter 11 purpose of ensuring that a debtor in possession act as a proper fiduciary to its creditors. To the extent the operation of state law would mean that a valuable estate cause of action that could be the source of creditor recoveries would not be pursued, such a result would certainly frustrate the congressional purpose recognized in *Cybergenics*. Such a state law would be preempted on that basis.[88]

This is not to take issue in any way with the principle that "a court should not find pre-emption too readily in the absence of clear evidence of a conflict,"[89] or to suggest that the Bankruptcy Code should be read to sweep aside any state law that might operate to reduce creditor recoveries or make it more difficult to reorganize a

---

that "a person ceases to be a member of a limited liability company" when that person files for bankruptcy. In *In re Envision Healthcare Corp.*, 655 B.R. 701 (Bankr. S.D. Tex. 2023), the debtor was a member of a Delaware limited liability company. The court found that other members could not rely on § 18-304 to deprive the debtor of its membership interest on account of the debtor's bankruptcy because the provision was preempted by § 541(c)(1)(B), which invalidates *ipso facto* provisions in non-bankruptcy law such as that contained in § 18-304. *See* 11 U.S.C. § 541(c)(1)(B) ("an interest of the debtor in property becomes property of the estate … notwithstanding any provision in … applicable nonbankruptcy law … that is conditioned on … the commencement of a case under this title").

[88] *See generally Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) (holding that to permit state law tort action against automotive maker that did not equip vehicles with airbags, but had complied with applicable federal regulations, would frustrate federal interest in the gradual development of passive restraint devices).

[89] *Id.* at 885.

business in financial distress.  "No legislation pursues its purposes at all costs," and the Bankruptcy Code is no exception.[90]  Broadly speaking, the Bankruptcy Code seeks to strike a balance between achieving bankruptcy objectives and proper respect for non-bankruptcy law.  Generally speaking, the Code disturbs non-bankruptcy rights and entitlements only when doing so is truly critical to accomplishing a key bankruptcy purpose.[91]

But no objective of chapter 11 is more critical than ensuring that the debtor in possession operate as a faithful trustee.  Any state law that would operate to preclude a bankruptcy court from granting a committee standing to pursue an estate cause of action, no differently from a state law that would preclude a bankruptcy court from appointing a chapter 11 trustee or converting a case to chapter 7, would frustrate that congressional purpose and thus be preempted by the Bankruptcy Code.[92]

## III.  None of the reasons offered in support of the contrary result is persuasive.

There are four arguments that have been advanced for the contrary position. None, however, is sufficient to overcome the obligation to adhere to the binding *Cybergenics* precedent.

---

[90] *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

[91] *See generally Butner v. United States*, 440 U.S. 48 (1979); Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* (1986).

[92] *See MSR Exploration v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir. 1996) ("It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process.").

### A. *Cybergenics* committee standing is not limited to § 544 avoidance actions.

Defendants argue that even if *Cybergenics* is controlling precedent and means that that a bankruptcy court may in certain circumstances authorize committee standing for a Delaware limited liability company notwithstanding Delaware state law, this case is sufficiently different from *Cybergenics* that its reasoning does not apply.

Defendants argue that the Third Circuit's reliance on §§ 1109(b), 1103(c)(5), and 503(b)(3)(B) suggest that its reasoning applies to a debtor's failure to bring an avoidance action under § 544 (which were the factual circumstances of that case) but not a claim for breach of fiduciary duty.[93]

Defendants further emphasize that the *Cybergenics* court stated that the relevant provisions of the Bankruptcy Code "evince Congress's approval of derivative *avoidance actions* by creditors' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue *an avoidance claim*."[94]

It is true that on its facts *Cybergenics* arose from a committee motion seeking standing to bring an avoidance action and not a suit for breach of fiduciary duty.  And it is also true that § 503(b)(3)(B), one of the provisions on which the Third Circuit relied, is focused on a creditor that "recovers, after the court's approval, for the benefit

---

[93] D.I. 1099 at 12-13.

[94] *Cybergenics*, 330 F.3d at 553 (emphasis added).  *See also* Oct. 19, 2023 Hr'g Tr. at 61-62 (counsel for defendant emphasizing this passage of the *Cybergenics* opinion).

31

of the estate any property transferred … by the debtor." This provision, to be sure, relates to avoidance actions but not claims for breach of fiduciary duty.

Nevertheless, reading *Cybergenics* to be limited to avoidance actions, and not to extend to other potentially valuable estate causes of action that a debtor in possession declines to pursue, is to take an unduly blinkered approach to the Third Circuit's decision. The opinion explains, after all, that the Bankruptcy Code effectively codified the established pre-Code practice of permitting bankruptcy courts to authorize derivative standing when the trustee or debtor-in-possession refused to act in the best interests of the estate. There is no suggestion that the pre-Code practice was limited to avoidance actions. Indeed, the cases on which the Third Circuit relied in describing that pre-Code practice included an Eighth Circuit case from 1900 involving a claims allowance appeal.[95]

The Third Circuit also relied heavily on the Second Circuit's decision in *Commodore* for the proposition that the text of § 544(b), which authorizes the "trustee" to bring certain avoidance actions, did not (in light of *Hartford Underwriters*) mean that *only* the trustee could bring such a lawsuit.[96] *Commodore*, however, involved (like this case does) a lawsuit for breach of fiduciary duty. Indeed, the *Commodore* decision makes no reference to § 544 or an avoidance action. The Third Circuit's reliance on that precedent would therefore have been inexplicable had the Third Circuit believed that its decision were limited to avoidance actions and had

---

[95] *See id.* at 569 (quoting *Chatfield v. O'Dwyer*, 101 F. 797 (8th Cir. 1900)).

[96] *Cybergenics*, 330 F.3d at 566 (quoting *In re Commodore Int'l Ltd*, 262 F.3d 96 (2d Cir. 2001)).

no application to suits for breach of fiduciary duty.  The Court accordingly rejects the claim that *Cybergenics* does not extend beyond avoidance actions.

### B.  Applying *Cybergenics* does not give the estate greater rights than it would have outside of bankruptcy.

A second argument that is advanced for the view that the Delaware Limited Liability Company Act bars committee standing in bankruptcy relies on the fundamental bankruptcy principle that the rights and causes of action that come into the bankruptcy estate upon the bankruptcy filing under § 541(a) of the Bankruptcy Code are exactly those that were held by the debtor immediately before the bankruptcy.  The bankruptcy filing thus operates neither to expand nor contract estate property.[97]

The argument is that because the defendants could not have been sued in a derivative lawsuit for breach of fiduciary duty outside of bankruptcy, they are thus entitled to be equally free from such litigation after the bankruptcy filing.  While perhaps superficially appealing, this contention is incorrect.  The flaw in the reasoning is that the focus of this principle of neutrality is on the rights of the bankruptcy estate, not on which party is exercising those rights.  To be sure, the estate's rights neither expand nor contract on account of the bankruptcy filing.  But authorizing committee standing does not expand the estate's rights.  After all, the claim for breach of fiduciary duty is one that the debtors could have filed either before or after the bankruptcy.  An order granting committee standing simply empowers the

---

[97] *See generally Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) (citing *Board of Trade of Chicago v. Johnson*, 241 U.S. 1, 15 (1924)).

committee to act as the voice of the estate with respect to the very same lawsuit the debtor-in-possession could have brought itself. The *Cybergenics* principle thus does not alter the *substance* of the estate's entitlements in any way. It affects only the procedures for asserting a claim that the estate in fact holds. This is the point that the Fifth Circuit made in *Louisiana World Exposition v. Federal Ins. Co.,* discussed above, when it permitted a committee to bring suit against the directors of Louisiana non-profit corporation who, outside of bankruptcy, could not have been sued directly by creditors but only by a receiver.[98] Authorizing committee standing is merely "a procedural device, authorized by the Code, which does not affect state created property interests."[99]

### C. The *Cybergenics* action is its own claim; it does not incorporate state law of derivative standing.

Perhaps the strongest argument that might be made in favor of the application of the Delaware Limited Liability Company Act to the *Cybergenics* action would be that even though the authority to grant committee standing is *federal* in nature, being derived from the Bankruptcy Code, the Bankruptcy Code should be understood to incorporate applicable state law. In view of the internal affairs doctrine and the traditional principle that matters of corporate law are governed by the law of the state of incorporation, the argument is that to the extent the Bankruptcy Code would authorize a committee to have standing to pursue an estate cause of action with respect to a debtor incorporated under Delaware law, Congress would have intended

---

[98] 858 F.2d at 251.

[99] *Id.* at 252.

that the action be subject to the requirements of Delaware law, including the Delaware Limited Liability Company Act.

Indeed, the Supreme Court embraced a similar argument in *Burks v. Lasker*.[100] There, the Court addressed whether independent directors could terminate a derivative action brought by members of a corporation's board and its investment advisor under two federal statutes – the Investment Company Act and the Investment Advisors Act. Fundamental Investors, Inc. had purchased $20 million in commercial paper from Penn Central Transportation Co.[101] The complaint alleged that the defendants had breached their fiduciary duties, imposed by these federal statutes, by failing to conduct an adequate investigation into the financial condition of Penn Central before purchasing the commercial paper.[102] (Penn Central ended up reorganizing in bankruptcy, which presumably required Fundamental Investors to incur losses on its investment in Penn Central's commercial paper.) While neither of the federal statutes creates an express private right of action, the Court proceeded on the assumption (which was not disputed) that these statutes created implied private rights of action that could be enforced by shareholders through derivative litigation.[103]

Because the case was based "on the premise of the existence of a federal cause of action," the Court explained that the principles of *Erie R. Co. v. Tompkins* were not

---

[100] 441 U.S. 471 (1979).

[101] *Id.* at 473-474.

[102] *Id.*

[103] *Id.* at 475-476.

controlling, such that state law would not "operate of its own force."[104]  Even so, the fact that the claim was a federal one "does not, however, make state law irrelevant."[105] While "in certain areas" the Court has held "that federal statutes authorize the federal courts to fashion a complete body of federal law," the *Burks* Court explained that "[c]orporation law … is not such an area."[106]  Rather, the "first place one must look to determine the power of corporate directors is the relevant State's corporation law."[107]  Because corporations "are creatures of state law," when Congress acts in a way that imposes duties on corporate officers, it acts "against the background of existing state law."[108]

Accordingly, neither the Investment Company Act nor the Investment Advisors Act would "displace state laws governing the powers of directors unless the state permit actions prohibited by the Acts, or unless their application would be inconsistent with the federal policy underlying the cause of action."[109]  On that point, the Court emphasized that "federal courts must be ever vigilant to insure that application of state law poses no significant threat to any identifiable federal policy

---

[104] *Id.* at 476 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[105] *Id.* at 477.

[106] *Burks*, 441 U.S. at 477.

[107] *Id.* at 478.

[108] *Id.*

[109] *Id.* at 479 (internal quotation and citations omitted).

or interest."[110]  Otherwise put, the task of the federal court is to make certain that "nothing the state can do will be allowed to destroy the federal right."[111]

The Court observed that if state law permitted the independent directors to terminate the suit, the "next inquiry should have been whether such a state rule was consistent with the policy of the [federal securities statutes]."[112]  The Supreme Court found that allowing independent directors to terminate a derivative suit would not necessarily conflict with the aims of the federal securities laws and remanded the case to the lower courts for consideration of the state law question.[113]

How does *Burks* apply here?  *First,* it is not entirely obvious that *Burks* applies at all to this circumstance.   There is certainly not a word in the exhaustive *Cybergenics* opinion that suggests that the Third Circuit believed that when the Bankruptcy Code contemplates authorizing a committee to pursue an estate cause of action, that the mechanic for doing so would be to "borrow" a state-law derivative action.   No one would contend that a bankruptcy court would need to "borrow" the state law for the appointment of a receiver or trustee in connection with the

---

[110] *Id.* (internal quotation and citation omitted).

[111] *Id.* at 480 (internal quotation and citation omitted).

[112] *Burks*, 441 U.S. at 480.

[113] *See also Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991) (applying *Burks*, noting that "a court should endeavor to fill the interstices of federal remedial schemes … only when the scheme in question evidences a distinct need for nationwide legal standards," and concluding that in a derivative suit under the Investment Company Act, the demand futility requirement provided by state law should apply); *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) (observing that there are occasions where certain "uniquely federal interests" are "so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed … by the courts – so-called 'federal common law.'") (internal citations and quotations omitted).

appointment of a chapter 11 trustee or converting a case to chapter 7.  These are express federal remedies that need not "incorporate" any principle of state law.  The better reading of *Cybergenics*, in this Court's view, is that the *en banc* Third Circuit viewed an order authorizing committee standing the same way – a direct (though implicit) federal remedy that did not involve the "borrowing" of any law.  The parts of the *Cybergenic* opinion that describe the authorization of committee standing as the carrying forward of an established equitable remedy that was regularly employed by the federal courts under pre-Code practice are consistent with this approach.[114]

*Second*, even if the *Burks* analysis does apply, then the rationale of *Cybergenics* would require the conclusion that application of the Delaware Limited Liability Company Act would interfere with the federal interest in ensuring that the trustee in bankruptcy faithfully discharge its own fiduciary duties to creditors and the estate.  The fundamental point of *Cybergenics* is that there are circumstances in which a debtor's management may not be well suited to make a decision that is in the best interests of the bankruptcy estate.  One such circumstance is when managers must decide whether to authorize the company to file suit against themselves.  Because of the federal bankruptcy policy of ensuring that the party in charge of a bankruptcy estate serves as a faithful trustee looking out for the estate's ultimate beneficiaries – typically creditors – *Cybergenics* operates to put a disinterested party in charge of that decision.  At least in the context of an insolvent debtor, there is no escaping the conclusion that the effect of the Delaware Limited Liability Company Act would be

---

[114] *See Cybergenics*, 330 F.3d at 567-572.

to ensure that the fox remain in charge of the henhouse.  Because that result is the opposite of what *Cybergenics* and the Bankruptcy Code seek to accomplish, this is precisely the situation (if the *Burks* analysis were applicable) in which the Delaware Limited Liability Company Act would be inconsistent with the policy objectives of the federal Bankruptcy Code.

Accordingly, to the extent one views the question as a choice between "borrowing" a state law rule or "devising" a federal common law of derivative actions, the type of derivative action contemplated by *Cybergenics* would not "borrow" the provisions of the Delaware Limited Liability Company Act that would operate to defeat the very cause of action it contemplated.

**D.   Despite the imperative to adhere to this Court's precedent, the three published opinions of judges of this Court cannot overcome the need to apply the Third Circuit's *Cybergenics* opinion.**

Notwithstanding the points set forth above, three judges of this Court have issued published opinions reaching the opposite conclusion.  That is certainly reason to pause.  In the federal courts' hierarchal system of precedent, only the binding decisions of a court that can review a rendering court's decision are controlling precedent.  Accordingly, no trial court is bound by another trial court's decision.  Even so, on a multi-judge trial court, there are sound prudential reasons to strive for consensus.  Obtaining such consensus provides clarity and predictability, both important rule-of-law values.  And it can be argued that such predictability is of particular importance in areas of commercial law like bankruptcy, where parties can

be expected to rely on the consistent application of settled law in their commercial dealings.

In addition to the benefits of uniformity, there are further reasons to pause before a judge breaks with the uniform rulings of other judges on the same court. One of those reasons is modesty. A system of respect for precedent takes advantage of the "wisdom of crowds" to maximize the likelihood of obtaining the correct answer. Overconfidence in one's own opinion is perhaps a common human quirk – one from which federal judges are not particularly known to be immune. When one's own judgment about how to resolve an issue differs from that of the "crowd," part of the judicial task ought to be to think long and hard about whether one's own judgment about the matter is wrong.

For all of these reasons, where the law on a question is uniform in this Court, the undersigned judge typically adheres to it without so much as considering whether, from first principles, an argument could be made to the contrary. What is different here, however, is that the obligation to adhere to binding circuit precedent must come ahead of the desire to achieve consensus. And as described below, the prior decisions did not address how the *Cybergenics* opinion affected the proper resolution of the question at issue.

The *first* of the three decisions is *In re HH Liquidation,* in which a creditors' committee sought to pursue breach of fiduciary duty claims against managers of several limited liability companies.[115] The relevant discussion was three paragraphs

---

[115] *In re HH Liquidation, LLC,* 590 B.R. 211 (Bankr. D. Del. 2018).

of a very lengthy opinion that addressed many other issues.  The opinion correctly explained that the Delaware Limited Liability Company Act and the Delaware Supreme Court decision in *Bax* deny creditors the ability to pursue state-law derivative actions.[116]   The opinion, however, neither mentions *Cybergenics* nor engages the question of how the unavailability of a state-law derivative action ought to affect the court's authority to grant the federal remedy described in *Cybergenics*.

The *second* case is *In re PennySaver*.[117]   That, too, was a lengthy opinion that addressed many issues.  Importantly, the plaintiff in that action was a chapter 7 trustee, not a creditors' committee seeking derivative standing under *Cybergenics*.  The trustee's lawsuit alleged that the defendants caused the debtors to make fraudulent transfers, thus injuring the debtors.  In a case in which a shareholder complains about a fiduciary's decision that caused harm to the company, the relevant fiduciary duty is the one running to the company.  That is why, when a claim for breach of fiduciary duty is asserted by creditors or shareholders, it can only be enforced derivatively.[118]

*PennySaver*, however, was a chapter 7 case.  And while it is true that there are cases suggesting that a chapter 7 trustee is acting in a derivative capacity when it asserts estate causes of action, the better view is that a chapter 7 trustee can *directly* assert claims for breach of duties that run to the entity – no differently than if a

---

[116] *Id.* at 283-285.

[117] *In re PennySaver USA Publishing, LLC,* 587 B.R. 445 (Bankr. D. Del. 2018).

[118] *See generally Agostino v. Hicks*, 845 A.2d 1110, 1122 (Del. Ch. 2004).

corporation's shareholders had replaced the board of directors and the new board installed a new management team – without the need to seek derivative standing.[119] Perhaps as a result of the confusing nature of the trustee's complaint, however, the court treated this as a derivative claim, and found that the Delaware Limited Liability Company Act and *Bax* barred the trustee from proceeding on a derivative basis.[120] This part of the *PennySaver* opinion does not explain why a chapter 7 trustee, who as a matter of federal law has the legal authority to act on behalf of the debtor itself, would require derivative standing. And to the extent the authority to grant derivative standing were relevant, the opinion does not mention *Cybergenics* or address its reasoning.

*Finally,* in *In re Citadel Watford*, a committee was granted standing to pursue certain estate claims.[121] Thereafter, a plan was confirmed that gave a post-confirmation trust the authority to assert all estate causes of action, including those as to which the committee had previously been granted standing. The trust was then substituted as the plaintiff in a breach of fiduciary duty lawsuit that had been filed

---

[119] *Compare In re Golden Guernsey Dairy, LLC*, 548 B.R. 410, 413 (Bankr. D. Del. 2015) (rejecting defense to fiduciary duty claim asserted by a chapter 7 trustee, based on *Bax* and the Delaware Limited Liability Company Act, because the "Trustee in this Chapter 7 proceeding is the sole representative of the estate with the authority to sue and be sued … [and] is charged with pursuing the estate's interests" and thus is not suing derivatively) (internal quotations and citations omitted); and *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (the trustee may sue on behalf of the corporation itself) *with In re VarTec Telecom, Inc.*, No. 06-03506, 2007 WL 2872283, at *4 (Bankr. N.D. Tex. Sept. 24, 2007) (suggesting that suit by chapter 7 trustee was a derivative action).

[120] *PennySaver*, 587 B.R. at 467.

[121] *Citadel Watford*, 603 B.R. 897.

by the creditors' committee before confirmation, following the court's entry of an order granting committee standing.

Because the post-confirmation trust was given the authority to pursue all estate causes of action, *Citadel Watford*, just like the cases involving chapter 7 trustees on the better view of this question, should not have required the consideration of any question of derivative standing.  The post-confirmation trust was the successor to the debtor and had all of the rights the debtor did to bring estate causes of action.  Such an action should not be viewed as derivative.  Nevertheless, the *Citadel Watford* court followed the analysis in *PennySaver* and dismissed the claims for breach of fiduciary duty on the ground that they were barred by the reasoning of *Bax*.  The case makes no mention of *Cybergenics* or engages its reasoning in any way.[122]

As described in detail in Part I.C above, this Court's analysis of the Third Circuit's decision in *Cybergenics* leads it to conclude that the decision treated the authority of a bankruptcy court to grant derivative standing to a creditors' committee as federal remedy that did not implicate state law.  Despite the Court's strong reluctance to break with a uniform position adopted by other judges of this Court, it concludes that in the circumstances presented here, it is required to do so.  Third Circuit precedent is formally binding on this Court in a way that the decisions of other

---

[122] In addition to these three reported decisions, two unreported decisions reach the same conclusion.  *See In re Dura Automotive Systems,* Bankr. D. Del. No. 19-12378, June 9, 2020 Hr'g Tr. at 45-48; *In re Ector County Energy Center LLC*, Bankr. D. Del. No. 22-10320, Aug. 17, 2022 Hr'g Tr. at 59-61.  It bears note, however, that Judge Dorsey's ruling in *Ector County Energy Center* emphasized that the standing motion was brought by an individual creditor rather than an official committee of unsecured creditors.

judges of this Court are not. Additionally, the opinions that rely on *Bax* and the Delaware Limited Liability Company Act to preclude derivative standing do not explain how that conclusion can be reconciled with *Cybergenics*. Accordingly, this Court concludes that it must respectfully disagree with the three published opinions in favor of adhering to the reasoning set out by the *en banc* Third Circuit decision.

## IV. The traditional standards for granting committee standing are satisfied for the objecting defendants.

Having concluded that the debtor's status as a limited liability company does not preclude the Committee from seeking standing to assert the claims, the Court now turns to the applicable standard that governs a standing motion. Judges of this Court and the Third Circuit have held that to be granted derivative standing:

> the moving party must demonstrate that (i) the debtor-in-possession has unjustifiably refused to pursue the claim or refused to consent to the moving party's pursuit of the claim on behalf of the debtor-in-possession; [and] (ii) the moving party has alleged colorable claims[123]

This Court will follow Judge Shannon's decision in *Optim Energy* in taking those questions in the opposite order: (a) are the claims colorable; and (b) is the debtor's refusal to assert the claim unjustified. The Court will also address, as several other decisions have suggested, a third question – (c) whether pursuit of the claims would likely be beneficial to the bankruptcy estate.[124]

---

[123] *In re Optim Energy, LLC*, No. 14-10262-BLS, 2014 WL 1924908, at *6 (Bankr. D. Del. May 13, 2014) (citing *Cybergenics*, 330 F.3d 548). *See also In re Pursuit Capital Mgmt.*, 595 B.R. 631, 664 (Bankr. D. Del. 2018).

[124] While the *Cybergenics* decision also treated as a prong of the analysis the question whether the moving party has received leave to sue from the bankruptcy court, *Cybergenics*, 330 F.3d at 561, 566, the inclusion of that factor obviously does not make sense from the perspective of the bankruptcy court being asked to grant that leave.

## A.    The claims are colorable.

The typical articulation of the first part of this test is that a "claim is colorable if it would survive a motion to dismiss."[125]  Otherwise put, to be colorable, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[126]  There, "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[127]

The defendants argue that the claims are not colorable since Packable's operating agreement exculpated each of them as managers from being personally liable to the company or its members for monetary damages for a breach of fiduciary duties.[128]  Recall, as discussed in Part I.B above, that the Delaware Limited Liability Company Act, in addition to limiting derivative standing to members and assignees, also permits the members of a limited liability company, in its formation documents, to disclaim fiduciary duties running to the entity.  Unlike the provisions addressed to who may maintain a derivative lawsuit, which are procedural in nature, the disclaimer of fiduciary duties affect the *substance* of the rights that the debtor would have had as of the time of the bankruptcy filing.  Accordingly, to the extent state law permits the disclaimer of fiduciary duties, that is fully respected and controlling in

---

[125] *In re Pursuit Capital Mgmt.*, 595 B.R. at 665 (citing *In re Optim Energy*, 2014 WL 1924908, at 6).

[126] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

[127] *Iqbal,* 556 U.S. at 678.

[128] D.I. 1099 at 5, 7.

bankruptcy, as the bankruptcy estate obtains under § 541(a) only those rights that the debtor held as of the time of the bankruptcy filing.

Here, Packable's operating agreement waived the managers' personal liability for breach of fiduciary duties to the company and between members.  Exculpating personal liability precludes the imposition of monetary damages in a claim against a manager for breach of fiduciary duty.  Claims that the managers breached their fiduciary duties therefore are not colorable.[129]  The Committee is accordingly barred from seeking monetary damages against the objecting defendants for fiduciary duty breaches in their managerial capacity.

In addition to asserting claims against the objecting defendants in their capacity as managers, however, the Committee also seeks to assert claims against them in their capacities as officers.  Packable's operating agreement does not exculpate its officers for personal liability for breach of fiduciary duty.  To the contrary, the operating agreement states that:

> The officers of the Company and its Company Subsidiaries, in the performance of their duties as such, shall owe to the Company and its Company Subsidiaries fiduciary duties (including duties of loyalty and due care) of the type owed by an officer of a corporation to such corporation and its stockholders under the laws of the State of Delaware.

The Committee's complaint asserts breach of fiduciary duty claims against these same defendants in their capacities as officers of the debtor.  At least at the

---

[129] "A claim that has clearly been waived is no longer colorable."  *In re Calore Express Co.,* 288 F.3d 22, 35 (1st Cir. 2002) (citing *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 35 (1st Cir. 1994); *see also In re Optim Energy,* 2014 WL 1924908, at *6 (finding that where a LLC operating agreement waived fiduciary duties, claims for breaches of fiduciary duties and aiding and abetting breach of fiduciary duty claims must fail).

motion to dismiss stage, it would not appear that a claim against an officer in one's capacity as such would be precluded by the fact that the officer also happens to be a manager who has the benefit of an exculpation against liability incurred in *that* capacity.

In *In re Solutions Liquidation LLC,* the trustee sued the defendants, some of whom served as managers, and others of whom served as officers, for breach of fiduciary duty claims in those capacities.[130]  The defendants, however, argued that the trustee failed to state a claim for which relief could be granted because the exculpatory clause in the operating agreement bars such claims against managers.[131] The court agreed with that proposition as it applied to those defendants who were managers but not those who were officers.[132]

Here, the complaint alleges that the debtors' founders served as both officers and managers.[133]  While the operating agreement does eliminate liability for managers, it does not appear to exculpate anyone for actions taken in their capacity

---

[130] *In re Solutions Liquidation LLC,* 608 B.R. 384 (Bankr. D. Del. 2019).

[131] *Id.* at 393-394.

[132] *Id. See also In re Mindbody, Inc., Shareholder Litig.*, No. 2019-0442-KSJM, 2023 WL 2518149, at *31 n. 493 (Del. Ch. Mar. 15, 2023) ("In his capacity as a director, Stollmeyer was protected by an exculpatory charter provision, which means that Plaintiffs would have to prove that Stollmeyer acted disloyally or in bad faith to prevail on a claim against him as a director.  Mindbody's exculpatory charter provision did not protect Stollmeyer from liability when he was acting as an officer.  Generally, when a defendant acted in both exculpated and unexculpated capacities, the court must distinguish in which capacity the defendants acted to resolve the claim for liability."); *In re McDonald's Corp. Shareholder Derivative Litig.*, 289 A.3d 343 (Del. Ch. 2023).

[133] Adversary D.I. 1 ¶¶ 29-33.

as officers.   The complaint accordingly appears to be colorable as against the defendants in their capacity as officers.

The Court adds, however, that this issue of the scope of the exculpation and the different capacities in which the defendants served was raised by the Committee only in a post-argument brief to which the defendants have not had the opportunity to respond.   Under the circumstances, the Court is comfortable concluding that the claim is sufficiently "colorable" to satisfy the requirement necessary for the Committee to be granted standing to assert it.   The usual formulation of the standard equates "colorable" with sufficient to survive a motion to dismiss.   The Court believes, however, that in the unusual circumstances of this case in which the question of committee standing is now ripe for decision without the question of "capacity" having been fully joined by the parties' briefs, that its finding that the claim is "colorable" should not preclude the defendants from responding, at the motion to dismiss stage, to this contention.   Accordingly, this finding that the complaint is "colorable" is expressly without prejudice to being reconsidered to the extent the defendants seek to respond to this argument by moving to dismiss the complaint.

**B.   The debtors unjustifiably refused to consent; demanding that the debtors pursue the claims would be futile.**

The Committee satisfies the first part of this standard.   It is not disputed that the Committee requested that the debtors consent to committee standing to prosecute these claims.   The debtors declined to consent to committee standing. [134]   An action is

---

[134] D.I. 1027 at 6.

considered unjustifiably refused when the requesting party demonstrates the claim is colorable and the trustee or debtor-in-possession fails to establish a legitimate reason for not pursuing the action.[135]

Judges of this Court and elsewhere have recognized that asking a trustee or debtor-in-possession "to take action may be excused if such a demand would be futile."[136]  Likewise, courts have discretion to excuse making a demand when it would be futile.[137]  Here, demand would be futile because, to date, many of the named defendants still act as managers on the board for the debtors, and the debtors have already declined to consent to the Committee's standing.

### C.   Pursuit of the claims would likely benefit the debtors' estates.

While not an explicit requirement under *Cybergenics* for obtaining derivative standing, many other courts consider whether the committee's claim would benefit

---

[135] *See* 7 *Collier on Bankruptcy* ¶ 1109.05 (16th ed. 2023) (citing *In re Gibson Group,* 66 F.3d at 1438-39);  *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 202-03 (7th Cir. 1988); *Louisiana World Exposition*, 858 F.2d at 252-53.

[136] *In re Dura Automotive Systems, Inc.,* 379 B.R. 257, 263 (Bankr. D. Del. 2007) (the Court held that regardless of the no-action clause, the plaintiffs had a right to be heard on the issue at confirmation) (citing *Cypress Assoc., LLC v. Sunnyside Cogeneration Assoc. Project*, 2006 WL 668441, *6–7 (Del. Ch. Mar. 8, 2006)); *Ettlinger v. The Persian Rug and Carpet Co*., 142 N.Y. 189, 193 (N.Y. 1894).

[137] *VGS, Inc. v. Castiel,* No. 17995, 2003 WL 723285 (Del. Ch. Feb. 28, 2003) (demand considered futile when a reasonable doubt exists as to whether the LLC managers were disinterested or independent, or the challenged transaction was the product of a valid exercise of business judgment); *see also In re First Capital Holdings Corp.,* 146 B.R. 7, 9-11 (Bankr. C.D. Cal. 1992) (holding that bankruptcy courts have discretion to excuse the requirement of a demand upon a debtor-in-possession as futile when the creditors' committee's complaint is brought against the debtor's present officers, directors, insiders, and principal shareholders.  In reaching its decision, the court relied on the law of futility outside of bankruptcy to determine whether it applied in bankruptcy).

the bankruptcy estate based on a cost-benefit analysis.[138]    Other decisions of this Court have similarly held that even where claims are colorable, whether the committee should be able to prosecute the claims "turns on the outcome of a cost/benefit analysis."[139]

In conducting this analysis, courts typically consider the probability of success and the potential costs of litigation, including attorneys' fees.[140]    The likelihood of success should justify the anticipated delay and expenses to the estate.[141]

The Committee has represented that this claim is being asserted on a contingency basis.    Defendants do not dispute that assertion.    Accordingly, it does not appear that the pursuit of the claims would impose any material cost on the estate. While the Court is not in a position to offer a detailed assessment of the Committee's likelihood of success or its prospects on collecting if its claim is successful, the absence of any material litigation cost is sufficient to persuade the Court that, as a cost/benefit matter, it is a claim worth pursuing.

---

[138] *See, e.g., Gibson Group,* 66 F.3d 1436;  *STN Enterprises*, 779 F.2d at 905;  *see also* 7 *Collier on Bankruptcy* ¶ 1109.05 (16th ed. 2023) (stating that to obtain derivative standing a party in interest must show: (1) the trustee refused to pursue litigation after receiving a demand to take action, (2) the refusal must be unjustified, and (3) the claim, if successful, must be one that will benefit the estate).

[139] *In re Nat'l Forge Co.*, 326 B.R. 532, 548 (W.D. Pa. 2005) ("In determining whether a[d]ebtor's refusal is unjustified, courts generally perform a cost-benefit analysis of the claims to determine whether the creditors' claims have colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued.").

[140] *In re MIG, Inc.,* No. 09-12118-KG, 2009 WL 8662897, at *2 (Bankr. D. Del. Dec. 18, 2009).

[141] *Id.*

## V.   The Committee may assert the claim against those defendants that have not opposed the Committee's motion.

The objecting defendants make up only ten of 34 total named defendants in the Committee's complaint.[142]  While the Court has not addressed the three-part test to determine whether it is appropriate to grant committee standing with respect to the other 24 defendants, the Court is comfortable entering an order granting the Committee standing to proceed with its complaint against those defendants who have not objected.

This Court has explained elsewhere that except for matters of subject-matter jurisdiction that a court must consider even in the absence of it being raised by a party, the Court views its role primarily as resolving those disputes presented to it by the parties.[143]  It is thus incumbent on a party that has been properly served and objects to the relief sought to raise that objection.  Accordingly, the Court proceeds on the understanding that those defendants that have not objected to the Committee's motion for standing have consented to it.[144]

---

[142] D.I. 1117 at 17.

[143] *In re Arsenal Intermediate Holdings, LLC,* Bankr. D. Del. No. 23-10097-CTG, Mem. Op. at 11-12 (Mar. 27, 2023).

[144] That conclusion would be improper if a motion for committee standing raised a question of subject-matter jurisdiction.  Every federal court has an independent duty to assure itself of its own subject-matter jurisdiction before resolving a dispute on the merits.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  There are certainly contexts in which a party's "standing" is an element of a constitutional "case or controversy," and thus necessary for a federal court to exercise subject-matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  But not every use of the word "standing" implicates subject-matter jurisdiction.  *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 91 (1998).  Because the question of whether to grant a committee standing to pursue an estate cause of action is not one that bears on the existence of a constitutional case or controversy, the Court respectfully disagrees with the suggestion in *HH Liquidation*, 590 B.R. at 284, that the issue is one that "implicates subject matter jurisdiction."

**Conclusion**

For the forgoing reasons, the Court will grant in part and deny in part the Committee's motion for derivative standing to pursue the breach of fiduciary duty claims. The parties are directed to settle an appropriate order.

Dated: February 2, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE